IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NUMBER: 2:16-cr-378 |
| | ) | |
| -versus- | ) | |
| | ) | |
| MICHAEL THOMAS SLAGER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MOTION TO DISMISS THE INDICTMENT
ON THE GROUNDS OF DOUBLE JEOPARDY,
DUE PROCESS, AND CRUEL AND UNUSUAL PUNISHMENT**

Michael Thomas Slager ("Slager") contends that his rights under the Double Jeopardy, Due Process, and Cruel and Unusual Punishment Clauses of the United States Constitution have been violated by the simultaneous indictment and dual prosecution of him in state and federal court for the same alleged criminal conduct with the same underlying facts.

Slager was indicted by a Charleston County Grand Jury on June 8, 2015, for one count of murder in violation of S.C. Code Ann. §16-3-10.

Subsequent thereto, he was indicted by federal grand jury on May 10, 2016. The federal indictment set forth three counts: Count one charges deprivation of rights under color of law in violation of Title 18, U.S.C. §242. Count two charges the use of a weapon during the commission of a crime of violence in violation of Title 18 U.S.C. §924(c)(1)(A)(iii). Finally, count three charges obstruction of justice in violation of Title 18 U.S.C. 1512(b)(3).

Michael Slager's case was first called to trial in South Carolina state court on October 31, 2016. It lasted for more than a month and concluded in a mistrial on December 5, 2016. Over 50

witnesses were called to testify. The federal trial is currently set for May 15, 2017. The subsequent state trial was originally set for March 2017, but has now been rescheduled for August 2017. Thus, after five grueling weeks of trial in state court last year, Slager now faces two more trials: one in federal court and the other in state court.

It is absolutely undisputed that all of these charges are based on precisely the same facts, the fatal shooting of Walter Scott on April 4, 2014, while Slager was attempting to place Walter Scott under arrest.

Slager has been attempting to defend against two simultaneous prosecutions in two distinct courts for the same offense based on precisely the same facts. This burden is crushing, unfair, highly prejudicial, time consuming, and violative of the fundamental principle of due process, double jeopardy, and cruel and unusual punishment. The federal government and the state have benefited from joint prosecution and investigation. The financial, emotional, physical, investigative, and other burdens are substantial. Most significantly, the sheer burden in terms of the time spent on defending dual prosecution is overwhelming. Ultimately, dual prosecution is absolutely unnecessary to the ends of justice and undermines the efficient administration of the criminal process. This is especially so where the dual prosecution is completely overlapping, simultaneous, and involves precisely the same facts, as in the present case.

## A.   Double Jeopardy and the Dual Sovereignty Doctrine

*(1) Current United States Supreme Court Precedent*

The dual sovereignty doctrine has long been held to be an exception to the Double Jeopardy Clause. Dual sovereignty generally permits two separate sovereigns to punish for the same

conduct. Perhaps the earliest case is *Fox v. Ohio*, 46 U.S. (5 How) 410 (1847). See also *Moore v. Illinois*, 55 U.S. 13 (1852); *United States v. Cruikshank*, 92 U.S. 542 (1875); *United States v. Lanza*, 260 U.S. 377 (1922); *Westfall v. United States,* 274 U.S. 256, 258 (1927); *United States v. Wheeler,* 435 U.S. 313, 320 (1978); *Heath v. Alabama*, 474 U.S. 82, 87-90 (1985); and *Puerto Rico v. Sanchez Valle*, 579 U.S. __, 136 S. Ct. 1853 (2016) (discussing dual sovereignty but Puerto Rico held not to be a separate sovereign).

*(2) Scholarly Criticism of the Dual Sovereignty Doctrine*

However, the doctrine has faced consistent and intense scholarly and judicial criticism for years. Adam J. Adler, Note, *Dual Sovereignty, Due Process, and Duplicative Punishment: A New Solution to an Old Problem*, 124 Yale L.J. 448 (2014).

Arguing for total abolition of the dual sovereignty doctrine: Daniel A. Braun, *Praying to False Sovereigns: The Rule Permitting Successive Prosecutions in the Age of Cooperative Federalism*, 20 Am. J. Crim. L. 1, 10 (1992):

> The changed relationship between the state and the federal governments in the age of cooperative federalism has changed this country's criminal law and the process through which it is enforced. Officials and agencies that formerly acted as representatives of distinct and independent governments now occupy a "united front" against criminal activity. The Fifth Amendment guarantee that no person shall be "subject for the same offense to be twice put in jeopardy" is a provision "made in a constitution intended to endure for ages to come." As Chief Justice Marshall recognized, such provisions must at times be adapted in order to survive. The country has entered a new age in the way it deals with crime. If the protection from double jeopardy does not respond to the challenges that have arisen in this new age, it will lose some of its meaning.
>
> The argument set out [herein] blurs a line between the state and federal governments. However, in the area of criminal law, the clear line that formerly demarcated the distinct powers and responsibilities of those governments has already been smudged beyond recognition. The dual sovereignty doctrine beautifully restores the image of independent sovereign governments. In order to accomplish that result, however, the proponents of the doctrine have had no choice

but to craft and cling to a fiction that now utterly fails to resemble reality. As a result, the law they have created deserves the Constitution and imparts a guarded cynicism towards any claim that the guarantees in that document reflect an aspiration to justice.

*Id*. at 76 (citations omitted); Erin M. Cranman, Comment, *The Dual Sovereignty Exception to Double Jeopardy: A Champion of Justice or a Violation of a Fundamental Right?*, 14 Emory Int'l L. Rev. 1641, 1671-74 (2000); Michael A. Dawson, Note, *Popular Sovereignty, Double Jeopardy, and the Dual Sovereignty Doctrine*, 102 Yale L.J. 281, 302 (1992); and Kevin J. Hellmann, Note, *The Fallacy of Dueling Sovereignties: Why the Supreme Court Refuses to Eliminate the Dual Sovereignty Doctrine*, 2 J.L. & Pol'y 149, 153-55 (1994).

Arguing for a replacement of the dual sovereignty doctrine with an approach that would considerably limit successive or parallel prosecutions: Ophelia S. Camina, Note, *Selective Preemption: A Preferential Solution to the* Bartkus-Abbate *Rule in Successive Federal-State Prosecutions*, 57 Notre Dame Law. 340, 362-63 (1981) (proposing a system that would avoid successive state-federal prosecutions by allowing the federal government to intervene and selectively preempt a state prosecution); and Dax Eric Lopez, Note, *Not Twice for the Same: How the Dual Sovereignty Doctrine Is Used to Circumvent* Non Bis in Idem, 33 Vand. J. Transnat'l L. 1263, 1300-02 (2000) (arguing that the dual sovereignty doctrine should be replaced with joint trials).

Arguing for a substantial modification of the dual sovereignty doctrine: Akhil Reed Amar & Jonathan L. Marcus, *Double Jeopardy Law After Rodney King*, 95 Colum. L. Rev. 1, 2-3 (1995) (proposing to abolish the dual sovereignty doctrine except for offenses "committed by state officials and implicating the federal government's unique role under Section 5 of the Fourteenth Amendment"); Cranman, *supra* note 4, at 1677-78 (allowing a second prosecution only if the first prosecution was incompetent); James E. King, Note, *The Problem of Double Jeopardy in*

*Successive Federal-State Prosecutions: A Fifth Amendment Solution*, 31 Stan. L. Rev. 477, 496-97 (1979) (proposing a rule that would require governments to initiate a joint proceeding whenever their interests in obtaining a conviction are sufficiently similar); and Robert Matz, Note, *Dual Sovereignty and the Double Jeopardy Clause: If At First You Don't Convict, Try, Try Again*, 24 Fordham Urb. L.J. 53, 354-55 (1997) (arguing that successive prosecutions should not be allowed if the first prosecution results in an acquittal).

*(3) Judicial Criticism of the Dual Sovereignty Doctrine*

Judicial criticism has been equally intense. The Supreme Court addressed the dual sovereignty doctrine in the double jeopardy context when it decided *Bartkus v. Illinois,* 359 U.S. 121 (1959), and *Abbate v. United States,* 359 U.S. 187 (1959). Justice Black dissented in both cases, not convinced "that a State and the Nation can be considered two wholly separate sovereignties for the purpose of allowing them to do together what, generally, neither of them can do separately." *Abbate,* 359 U.S. at 203 (Black, J., dissenting). He observed that the dual sovereignty doctrine was not imported from English law's double jeopardy jurisprudence. It was judicially conjured in *Fox* and *United States v. Marigold,* 50 U.S. (9 How.) 560 (1850) to accommodate coexisting sovereigns in the American federal system.

> *Lanza* … seemed rather to rely on dicta in a number of past cases in this Court. These had assumed that identical conduct of an accused might be prosecuted twice, once by a State and once by the Federal Government, because the "offense" punished by each is in some, meaningful, sense different. The legal logic used to prove one thing to be two is too subtle for me to grasp.

*Abbate,* 359 U.S. at 202 (Black, J., dissenting). Concerned that the doctrine supplanted the individual's right to avoid successive prosecutions, Justice Black wrote:

> The Court apparently takes the position that a second trial for the same act is somehow less offensive if one of the trials is conducted by the Federal Government

and the other by a State. Looked at from the standpoint of the individual who is being prosecuted, … it hurts no less for two "Sovereigns" to inflict it than for one.

*Bartkus,* 359 U.S. at 155 (Black, J., dissenting). Observing that "the Court's reliance on federalism amounts to no more than the notion that, somehow, one act becomes two because two jurisdictions are involved," Justice Black implored that it be "discarded as a dangerous fiction." *Id.* at 158. He dismissed the majority's concern that "failure to allow double prosecutions would seriously impair law enforcement in both State and Nation" as premised on the "unwarranted assumption that State and Nation will seek to subvert each other's laws." *Id.* at 156. Drawing on principles of preemption, he explained that

> [t]he Federal Government is given power to act in limited areas only, but in matters properly within its scope it is supreme. It can retain exclusive control of such matters, or grant the States concurrent power on its own terms. If the States were to subvert federal laws in these areas by imposing inadequate penalties, Congress would have full power to protect the national interest, either by defining the crime to be punished and establishing minimum penalties applicable in both state and federal courts, or by excluding the States altogether.

*Id.* at 157; *see also id.* at 156 ("[M]ost civilized nations do not and have not needed the power to try people a second time to protect themselves even when dealing with foreign lands.").

In an opinion authored by Judge Adams, the Third Circuit explicitly encouraged reconsideration of the dual sovereignty "construct," which the Court had previously "deemed necessary in order to protect arguably separate governmental interests in law enforcement." *United States v. Grimes,* 641 F.2d 96, 101 (3d Cir. 1981). Judge Adams argued that *Bartkus* "appears open to question from two perspectives one of evolving constitutional principle; one of historical precedent." *Id.* at 101. Suggesting that the Court consider a "retreat from a rigid doctrine of dual sovereignty," *id.* at 102, Judge Adams opined that "an important predicate of the *Bartkus* opinion that the Fifth Amendment Double Jeopardy provision does not bind the states has been undercut by subsequent constitutional developments." *Id.* at 101. The question becomes, therefore, whether

successive federal or successive state proceedings can be validly distinguished from successive federal-state proceedings. And in the wake of *Benton*, which entails the equivalent enforcement of the Double Jeopardy Clause against state and federal governments, any conceptual difference is difficult to support. Whenever a constitutional provision is equally enforceable against the state and federal governments, it would appear inconsistent to allow the parallel actions of state and federal officials to produce results which would be constitutionally impermissible if accomplished by either jurisdiction alone. *Id.* at 102.

Judge Adams observed that *Bartkus* relied on case law pre-dating the Fourteenth Amendment, and long before "the present reality of a greatly expanded federal criminal law." *Id.* Most of the old cases, including *Fox*, "did not actually involve multiple prosecutions but simply raised the question whether both state and federal governments could make the same conduct a crime." *Id.* at 102-03. He found problematic the *Bartkus* Court's reliance on *Moore v. Illinois,* a case that "concerned the validity of state fugitive slave legislation … a politically freighted issue," leading him to conclude that "the Court's statement that a citizen owes allegiance to two sovereigns and may be liable to punishment for an infraction of the laws of either should be read with considerable caution." *Id.*  And Judge Adams described *Lanza* as "circumscribed by historical peculiarities," an anomaly from the perspective of federalism because it involved the Eighteenth (Prohibition) Amendment … unique in having established a hybrid terrain an area of concurrent state and national power where the federal government could not, should it desire, assert its supremacy. Extrapolation or generalizations regarding double jeopardy law created in such an unusual context would therefore appear unwarranted. *Id.* at 103-04. To Judge Adams's view, "developments in the application of the Bill of Rights to the states, consequent alterations in the system of dual sovereignty, and the historic idiosyncracies of various of the precedents upon which

*Bartkus* relie[d] may deprive the opinion of much of its force." *Id.* at 104; *see also United States v. Frumento,* 563 F.2d 1083, 1092 (3d Cir. 1977) (Aldisert, J., dissenting) ("I am of the view that *Abbate* was wrongly decided in 1959. The majority opinion never came to grips with Justice Black's analysis in dissent, joined by Chief Justice Warren and Justice Douglas, and no developing doctrine in the intervening eighteen years has persuaded me to alter my original views.").

A decade later, Judge Calabresi penned a concurrence in *United States v. All Assets of G.P.S. Auto. Corp.,* 66 F.3d 483 (2d Cir. 1995), which he titled, *Rethinking the Dual Sovereignty Doctrine. Id.* at 497–97 and n.13. Judge Calabresi began by observing that "since its very first application in *Lanza*, the dual sovereignty doctrine has been strongly criticized … from an originalist point of view[, for] its jurisprudential flaws[, as] unfaithful to the Fifth Amendment's historical roots [and] for relying on a notion of federalism that is inconsistent with other Supreme Court holdings." *Id.* at 497. He observed further that the doctrine emerged "during prohibition when there was considerable fear of state attempts to nullify federal liquor laws, as well as the doctrine's rebirth just at the time when state attempts to nullify federal desegregation laws and orders were at their height." *Id.* Admitting the important interest in a "sovereign's ability to enforce its own laws as it wishes," Judge Calabresi concluded nevertheless that "it is hard to justify limiting the reach of the Bill of Rights, adopted as it was to protect individual rights and liberties against governmental encroachment, on no stronger grounds than the relative cumbersomeness of plausible alternative measures that would protect the interests of the sovereigns involved." *Id.* at 498. He found it "difficult to accept generalized statements of sovereign interests as justifying the Clause's inapplicability to successive prosecutions by different governments." *Id.*

Judge Calabresi explained that his views were influenced by "the dramatic changes that have occurred in the relationship between the federal government and the states since the time of

*Bartkus* and *Abbate*, changes that have made what was then perhaps acceptable, or at least tolerable, far more dangerous today." *Id.* at 498. Since 1959, "the scope of federal criminal law has expanded enormously. And the number of crimes for which a defendant may be made subject to both a state and a federal prosecution has become very large." *Id.* Quoting generously from Judge Adams's opinion in *Grimes* a decade earlier, Judge Calabresi wrote:

> the recent expansion of federal criminal jurisdiction magnifies the impact of *Bartkus* and *Abbate*, thus rendering a reassessment of those decisions timely from a practical standpoint as well, since permitting successive state-federal prosecutions for the same act appears inconsistent with what is a most ancient principle in western jurisprudence - that the government may not twice place a person in jeopardy for the same offense.

*Id.* at 498-99 (quotation marks omitted). As well, "[t]he degree of cooperation between state and federal officials in criminal law enforcement has … reached unparalleled levels in the last few years," which "should cause one to wonder whether it makes much sense to maintain the fiction that federal and state governments are so separate in their interests that the dual sovereignty doctrine is universally needed to protect one from the other." *Id.* at 499. Judge Calabresi concluded his concurrence by welcoming "a new look by the High Court at the dual sovereignty doctrine and what it means today for the safeguards the Framers sought to place in the Double Jeopardy Clause." *Id.*

Following Judge Calabresi, it should be noted that joint efforts between state and local authorities have increased exponentially over the years, fueled by Congressional expansion of federal law into state-enforcement areas. An American Bar Association task force concluded that "[a] complex layer is being added to the overall criminal justice scheme, dramatically superimposing federal crimes on essentially localized conduct already criminalized by the states." James A. Strazzella, *Task Force on Federalization of Criminal Law*, 1998 A.B.A. Crim. Justice Sec. Rep. 18.  Congress encourages state and federal law enforcement to function as a unit, bound

together by information, technology, financial incentives, contractual arrangement, and statutory mandate. Congress adopted the Comprehensive Crime Control Act of 1984, federalizing many offenses that were traditionally enforced by state officials and expanding the roles of joint-jurisdictional task forces. *See also* 21 U.S.C. § 873 (authorizing the Attorney General to transfer forfeited property to any federal, state, or local agency that participated directly in the seizure or forfeiture of the property). Courts have approved such collaboration. *See United States v. Davis,* 906 F.2d 829, 831 (2d Cir. 1990) ("[C]ooperation between federal and local agencies has become increasingly important and increasingly commonplace."); *United States v. Jordan,* 870 F.2d 1310, 1313 (7th Cir. 1989) (finding nothing more than "commendable cooperation between state and federal law enforcement officials"); Daniel A. Braun, *Praying to False Sovereigns: The Rule Permitting Successive Prosecutions in the Age of Cooperative Federalism,* 20 Am. J. Crim. L. 1, 77, n.351 (1992). None of this has changed to date. In fact, the current case is a striking example of how federal and state law-enforcement work in symbiotic tandem.

Dual sovereignty is an out-of-date judicial construct fashioned in an era when the states and the federal government acted as two separate sovereigns pursuing *conflicting* criminal-law interests. Each had a different focus and agenda in law enforcement. Now, joint task forces, shared resources and combined training are common. In this new "age of 'cooperative federalism/ where the federal and state governments are waging a united front against many types of criminal activity," *Murphy,* 378 U.S. at 55-56, state and federal law enforcement routinely work as partners, not as competing sovereigns. "[A] sweeping postincorporation assault on dual sovereignty might insist that in a world where federal and state governments generally are presumed to, and do indeed, cooperate in investigating and enforcing criminal law, they should also be obliged to cooperate in hybrid adjudication to prevent ordinary citizens from being whipsawed." Akhil Reed

Amar & Jonathan L. Marcus, *Double Jeopardy Law After Rodney King,* 95 Colum. L. Rev. 1, 48 (1995).

*(4) Original Intent of the Framers and Dual Sovereignty*

A careful review of the historical and legal record reveals that the Dual Sovereignty Doctrine is not grounded in the Anglo-American common law tradition. As such, it is, at best, highly questionable whether the doctrine even has a firm basis in constitutional jurisprudence. The utter lack of support for the doctrine at common law in England or America demonstrates that it is time for a thorough consideration of dual sovereignty.

(a) English Common Law and Dual Sovereignty

In order to appreciate the shallowness of dual sovereignty, it is necessary to thoroughly understand some of the foundations that undergird double jeopardy, and, therefore, the concept of so-called dual sovereignty. Pursuant to 18th-century English law, a prosecution by one sovereign barred a subsequent prosecution by another. The most significant case at the time of the American Founding was *R. v. Roche*, 168 Eng. Rep. 169 (K.B. 1775). Roche was charged in England with murder. He has been acquitted of the exact same murder by a court in the Cape of Good Hope, a Dutch colony. The King's Bench ruled that the acquittal in a Dutch court "would be a bar" to prosecution in an English court. *Id.* While the defendant withdrew his *autrefois acquit* plea at trial -- the court refused to submit that plea together with a not-guilty plea – thus, *Roche* shows that the plea may apply across different sovereigns. As the reporter stated: "It is a bar, because a final determination in a Court having competent jurisdiction is conclusive in all Courts of concurrent jurisdiction: therefore if A., having killed a person in Spain, were there prosecuted, tried and

acquitted, and afterward were indicted here, at Common Law, he might plead the acquittal in Spain in bar." *Id.* at 169 note a. The other often cited English case was *R. v. Hutchinson*, in which the defendant had been found not-guilty of homicide in Portugal. However, upon returning to England he was formally charged for the same homicide. In the context of a *habeas* action before the King's Bench, the defendant "produced an exemplification of the Record of his acquittal in Portugal." *Id.* The King's Bench ruled that the foreign not-guilty verdict was a bar to prosecution in England. *See id.*; *see also Burrows v. Jemino*, 93 Eng. Rep. 815 (Ch. 1726); *Beak v. Thyrwhit*, 87 Eng. Rep. 124, 125 (K.B. 1688) (both cases discuss *Hutchinson*, however, there is no surviving official report).

English legal treatises and secondary authorities of the same time period all agree that at the time of the Founding, the common law rule was that "an acquittal on a criminal charge in a foreign country may be pleaded in bar of an indictment for the same offence in England." Leonard MacNally, *The Rules of Evidence on Pleas of the Crown* 428 (1802) and Thomas Starkie, *A Treatise on Criminal Pleading* 301 note h (1814) ("Where the defendant has been tried by a foreign tribunal, it seems equally clear that an acquittal will enure to his defence in this country." (older English spelling in original)). Other English authorities of the time clearly noted that *autrefois* pleas applied across different sovereigns, they noted that an acquittal or conviction "will be sufficient to preclude any subsequent proceedings before every other tribunal." 1 Joseph Chitty, *A Practical Treatise on the Criminal Law* 458 (1816); *see also* 2 William Hawkins, *A Treatise of the Pleas of the Crown* 372 (1721) ("[A]n Acquittal in any Court whatsoever, which has a Jurisdiction of the Cause, is as good a Bar of any subsequent Prosecution for the same Crime, as an Acquittal in the Highest Court."); 4 William Blackstone, *Commentaries on the Laws of England* 329 (1770) ("[H]e may plead such acquittal in bar of any subsequent accusation of the same crime."); Francis

Buller, *An Introduction to the Law Relative to Trials at Nisi Prius* 245 (5th ed. 1788) (discussing *Hutchinson*).

It appears that British law remained the same well into the last century. *See R. v. Aughet*, 13 Cr. App. R. 101 (C.C.A. 1918). As one English authority noted, "it does not matter whether the [previous] trial was summary or on indictment, nor whether the Court is an English Court, or one of another of the King's dominions, or of a foreign country." 2 William Russell, *A Treatise on Crimes and Misdemeanors* 1820 (8th ed. 1923).

<u>(b) Early American Courts and Dual Sovereignty</u>

It is absolutely clear that the Double Jeopardy Clause was designed to guarantee that common law protections would be provided in the Constitution. Those protections rule out a subsequent prosecution regardless of which sovereign brought it. As Representative Samuel Livermore explained in the first Congress, the Clause "was declaratory of the law as it now stood," and codified "the universal practice in Great Britain, and in this country, that persons shall not be brought to a second trial for the same offense." 1 Annals of Cong. 782 (1789). Courts in America clearly shared this view of the law, referring to Double Jeopardy as a principle as "a sound and fundamental one of the common law." *People v. Goodwin*, 18 Johns. R. 187 (N.Y. 1820) and *United States v. Gibert*, 25 F. Cas. 1287, 1294 (C.C.D. Mass. 1834) (Story, J.) ("[T]he privilege thus secured is but a constitutional recognition of an old and well established maxim of the common law; and, therefore, we are to resort to the common law to ascertain its true use, interpretation, and limitation."). Other legal authorities also believed that the right was "imbedded in the very elements of the common law," and thus "has a deeper foundation than mere positive enactment." 3 Simon Greenleaf, *A Treatise on the Law of Evidence* 36 (1853) and Francis Wharton,

*A Treatise on the Criminal Law of the United States* 147 (1846) (describing the Double Jeopardy Clause as "nothing more than a solemn asseveration of the common law maxim").

Thus, there is overwhelming evidence that, consistent with the prevailing view, the Framers did not think these protections would be different if successive or simultaneous prosecutions were brought by multiple sovereigns. When the early text of the Fifth Amendment was being discussed and debated, the first Congress rebuffed a proposed amendment to narrow the common law rule to allow multiple prosecutions so long as only one of them was pursuant to federal laws. The original textual draft of the Double Jeopardy Clause provided: "No person shall be subject … to more than one trial or one punishment for the same offence." 1 Annals of Cong. 781 (1789). Representative George Partridge made the point that after "same offence," the words "by any law of the United States" should be added.  *Id.* at 782. Thereby conditioning Double Jeopardy prosecutions on whether one of the prosecutions was federal, Partridge's proposal would have, in effect, established the dual sovereignty doctrine. But Congress immediately and totally rejected the change offered by Partridge. *Id.*

The U.S. Supreme Court's early cases clearly demonstrated the common law understanding that double jeopardy concerns attached to multiple prosecutions by different sovereigns. In *Houston v. Moore*, 18 U.S. 1 (1820), the defendant had been found guilty by a state court martial of desertion. He claimed that the state lacked authority to prosecute him for that offense because desertion was also a federal crime, so a state conviction "might subject the accused to be twice tried for the same offence." *Id.* at 31. The Court handily rejected this argument with a clear statement of the traditional common law rule: "[I]f the jurisdiction of the two Courts be concurrent the sentence of either Court, either of conviction or acquittal, might be pleaded in bar of the prosecution before the other." *Id.*

Justice Story dissented in the *Houston* case because he believed that the state and federal governments could not exercise concurrent criminal jurisdiction; however, he agreed that the Double Jeopardy Clause would bar federal prosecution of a defendant already prosecuted by a state. This was the very reason why he dissented. If the state could prosecute a defendant for desertion, Justice Story pointed out, one of two impossible consequences would result: (1) the federal government would not be able to prosecute the defendant, or (2) "the delinquents are liable to be twice tried and punished for the same offence, against the manifest intent of the act of Congress, the principles of the common law, and the genius of our free government." *Id.* at 72 (Story, J., dissenting).

Justice Johnson was the sole justice of the *Houston* Court who had reservations about whether "an acquittal in the State Courts could be pleaded in bar to a prosecution in the Courts of the United States." *Id.* at 35 (Johnson, J., concurring in the judgment). Nevertheless, in subsequent case decided two weeks later, even Justice Johnson fully joined in accepting the traditional common law rule. In *United States v. Furlong*, 18 U.S. 184 (1820), the Court's unanimous opinion, written by Johnson, held: "[T]here can be no doubt that the plea of *autre fois acquit* would be good in any civilized State, though resting on a prosecution instituted in the Courts of any other civilized State." *Id.* at 197. Thus, the Court ruled that this plea did not bar the second prosecution on the facts of *Furlong*, because the defendant's first prosecution in a U.S. court—for a murder committed "by a foreigner upon a foreigner in a foreign ship," *id.*—had not been within the jurisdiction of the federal courts. The most significant point, however, is that this Court clearly endorsed the traditional common law rule that a prosecution by one sovereign, where that sovereign has jurisdiction, prohibits a subsequent prosecution by another sovereign.

The overwhelming majority of state courts to rule on this issue also held that a prosecution by one sovereign acts as a bar to a subsequent prosecution by another sovereign. Interestingly, one of the best examples of this is from the State of South Carolina. In *State v. Antonio*, 7 S.C.L. 776 (1816), South Carolina's Constitutional Court of Appeals utterly rejected a defendant's argument that a state conviction for counterfeiting left him open to a prosecution in federal court for the same offense. "[T]his could not possibly happen," the court ruled, "because it is the established comitas gentium, and is not unfrequently brought into practice, to discharge one accused of a crime, who has been tried by a court of competent jurisdiction. If this prevails among nations who are strangers to each other, could it fail to be exercised with us who are so intimately bound by political ties? But a guard yet more sure is to be found in the 7th article of amendments [*i.e.*, the Fifth Amendment] to the federal constitution." *Id.* at 781. Justice Grimke concurred. He argued that if counterfeiting were both a state and federal crime, either court would have to "allow of the plea of *autrefois acquit*, which will be a good bar to a second prosecution, because a determination in a court having competent jurisdiction, must be final and conclusive on all courts of concurrent jurisdiction." *Id.* at 788 (Grimke, J., concurring). Justice Nott dissented, but he too agreed that prosecution by both the state and federal governments would be "not only contrary to the express letter of the constitution, but contrary to the eternal and unerring principles of justice." *Id.* at 804 (Nott, J., dissenting).

Many other state cases of the same era are in accord. These decisions clearly recognized that double jeopardy principles would bar a second prosecution for the same offense by a different state. *See State v. Brown*, 2 N.C. 100, 101 (1794) (serial prosecutions by different states for horse theft would be "against natural justice, and therefore I cannot believe it to be law"). They reasoned—often in analyzing whether the federal government's criminal jurisdiction was

concurrent with or exclusive of the states'—that a conviction or acquittal in state court would bar a subsequent federal prosecution. *Harlan v. People*, 1 Doug. 207, 212-13 (Mich. 1843) (a state conviction "would be admitted in federal courts as a bar. This would follow necessarily from the exercise of a concurrent jurisdiction, even if it did not come strictly within the provision of the seventh article of the amendments of the constitution."); *Mattison v. State*, 3 Mo. 421, 426-28 (1834) (assuming, in analyzing preemption, that a state conviction or acquittal could bar a federal prosecution, but noting that common law requirements not met in that case); *id.* at 433 (Wash, J., dissenting) (explaining that a valid prosecution by a sovereign power "will bar any other or further prosecution for the same offense, *by the same or any other power* and may be so pleaded" (emphasis added)). And they recognized that the same plea could be interposed if a state prosecution followed a federal prosecution for the offense. See *State v. Randall*, 2 Aik. 89, 100-01 (Vt. 1827) (where state and federal courts have concurrent jurisdiction, "[t]he court that first has jurisdiction, by commencement of the prosecution, will retain the same till a decision is made; and a decision in one court will bar any further prosecution for the same offence, in that or any other court"); *Commonwealth v. Fuller*, 49 Mass. 313, 317-18 (1844) (where state and federal courts have concurrent criminal jurisdiction, "the delinquent cannot be tried and punished twice for the same offence, and … the supposed repugnancy between the several laws does not, in fact, injuriously affect any individual"); and *People ex rel. McMahon v. Sheriff*, 2 Edm. Sel. Cas. 324, 343-44 (N.Y. Sup. Ct. 1852) ("where the United States and the State courts have concurrent jurisdiction" over a criminal matter, "a judgment rendered in one [is] a bar to the recovery of a judgment in the other"). See generally *Manley v. People*, 7 N.Y. 295, 303 (1852) (citing *Houston v. Moore* in support of "the practice of the several federal and state courts as congress extends its

power by its enactments, and that is in allowing the judgment in one court to be pleaded in bar in the other").

American secondary authorities of the time closely follow their English counterparts, consistently holding that where state and federal courts have concurrent criminal jurisdiction, "the sentence of either court, whether of conviction or acquittal, might be pleaded in bar of the prosecution before the other." 1 James Kent, *Commentaries on American Law* 374 (1826); see also Thomas Sergeant, *Constitutional Law* 278 (2d ed. 1830) (same); Francis Wharton, *A Treatise on the Criminal Law of the United States* 137 (1846) (prosecution "will be sufficient to preclude any subsequent proceedings before every other court").

### (c) The U.S. Supreme Court Departed from the Original Understanding

There are several cases decided between 1847 and 1852, where the U.S. Supreme Court adopted the dual sovereignty doctrine. Two of these cases, *Fox v. Ohio*, 46 U.S. 410 (1847), and *United States v. Marigold*, 50 U.S. 560 (1850), suggest, but fail to unequivocally hold, that the federal and state governments may bring separate prosecutions for the same offense. However, the third case, *Moore v. Illinois*, 55 U.S. 13 (1852), demonstrably broke from the original meaning of the Double Jeopardy Clause, and the common law on which it is based, by ruling that the common law rule prohibiting multiple trials for the same offense was not applicable to serial or simultaneous state and federal prosecutions. These unfounded rulings evolved into what the Court now calls "the settled 'dual sovereignty' concept," *United States v. Wheeler*, 435 U.S. 313, 332 (1978), leaving the Double Jeopardy Clause unmoored from its original foundations.

The Court solidified its odd departure from the Double Jeopardy's original meaning in *Moore v. Illinois*, 55 U.S. 13 (1852). In *Moore*, the defendant had been found guilty in an Illinois state court of harboring a runaway slave. *Id.* at 17. He claimed that the Illinois statute was

preempted by the federal Fugitive Slave Act. To support this argument, he urged that permitting a state to prosecute would unlawfully make him to multiple prosecutions. The Court totally rejected this argument. This became Court's first clear statement of the concept of dual sovereignty:

> But admitting that the plaintiff in error may be liable to an action under the act of Congress, for the same acts of harboring and preventing the owner from retaking his slave, it does not follow that he would be twice punished for the same offense .... Every citizen of the United States is also a citizen of a State or territory. He may be said to owe allegiance to two sovereigns, and may be liable to punishment for an infraction of the laws of either. The same act may be an offence or transgression of the laws of both. ... That either or both may (if they see fit) punish such an offender, cannot be doubted. Yet it cannot be truly averred that the offender has been twice punished for the same offence; but only that by one act he has committed two offences, for each of which he is justly punishable. He could not plead the punishment by one in bar to a conviction by the other.

*Id.* at 19-20. With this holding, the Court imposed a new and unjustified limitation on the protections guaranteed by the Double Jeopardy Clause. It is a limitation which would have been totally alien to the Framers, as well as early English and American courts.

Strangely, in *Moore* the Court did not cite any precedent for this ruling other than *Fox* and *Marigold*. The Court did not thoroughly consider *Houston* or *Furlong*, the two 1820 cases clearly holding that a prosecution by one sovereign bars a second prosecution by the other sovereign. The Court failed to analyze any English cases, American lower-court cases, or secondary authorities from England or the U.S. Looking at the reported arguments of counsel in *Moore*, it is not clear whether counsel even brought contemporaneous English or lower-court cases to the Court's attention. The *Moore* Court, therefor, utterly failed to recognize or even explain its departure from the Double Jeopardy Clause's original meaning. See, e.g., *Jett*, 59 Va. at 939 (Rives, J., dissenting) (reasoning that under *Houston v. Moore* and the law "as it seemed to stand until" the Supreme Court's decisions in *Fox*, *Marigold*, and *Moore*, "the plea of *autrefois acquit* or *convict* would lay to either tribunal" where "*concurrent* jurisdiction remains in both courts"). The U.S. Supreme

Court's only reasoned application of dual sovereignty under the Double Jeopardy Clause is clearly based on a flawed and incomplete analysis of traditional common law and Founding-era sources.

### (B)   Due Process and Dual Sovereignty

Slager would reallege and reassert all that he has argued above. Many, if not most, of the above cited law review articles also make the case that the Dual Sovereignty Doctrine is violative of due process, not merely double jeopardy. Adam J. Adler, Note, *Dual Sovereignty, Due Process, and Duplicative Punishment: A New Solution to an Old Problem*, 124 Yale L.J. 448 (2014). Dual sovereignty violates notions of fundamental fairness which lay at the heart of due process. *Id.* See also *In Re Winship*, 397 U.S. 358 (1970); *Herring v. New York*, 422 U.S. 853 (1975); and *Santosky II v. Kramer*, 455 U.S. 745 (1982).

### (C)   Cruel and Unusual Punishment and Dual Sovereignty

Lastly, Slager would again reallege and reassert all that he has argued above. The Dual Sovereignty Doctrine constitutes cruel and unusual punishment within the meaning of the Eighth Amendment to the United States Constitution. See generally Nancy J. King, *Portioning Punishment: Constitutional Limits on Successive and Excessive Penalties*, 144 U. Pa. L. Rev. 101 (1995) (suggesting that multiple punishments imposed for the same crime might qualify as "excessive" under the Eighth Amendment).

> Overlapping offenses and penalties for the same conduct give prosecutors the freedom to prosecute and punish a defendant more than once for the same conduct. The fear that prosecutors will deliberately decline to join overlapping penalties in order to rehearse their case or persecute a defendant has prompted some to insist

that the Clause requires joinder of sufficiently similar offenses and penalties, even when a legislature created them separately

*Id*. at 130.

Just as courts that review punishment under the Eighth Amendment must consider all types of penalties in order to assess the true totality of punishment that the government exacts, they must not ignore certain penalties just because they were imposed in a different jurisdiction. The Eighth Amendment can and should bridge the gap left by double jeopardy's dual sovereignty exception, an exception that allows the states,[151] the federal government, and tribal governments to each prosecute the same defendant for essentially the same crime. Preventing a single jurisdiction from imposing a disproportionately severe penalty is not much of a shield against excessive punishment if several jurisdictions can freely cumulate punishment for the same wrong. A dual sovereignty exception to the Eighth Amendment is, for this reason, a mistake.

*Id*. at 154-5.

### (D)  Conclusion

Slager submits that the indictment should be dismissed. Maintaining a simultaneous prosecution in state and federal court presents serious issues of due process, double jeopardy, and cruel and unusual punishment. The crushing financial, emotional, physical, and time requirements necessary to defend such a case amount to a violation of the federal constitution as argued above. In addition, no legitimate ends of justice are served and the criminal process is burdened with an unnecessary and inefficient prosecution.

Respectfully submitted,

BY:   *S/Andrew J. Savage, III*
      ANDREW J. SAVAGE, III
      Federal ID Number: 3734
      SAVAGE LAW FIRM
      15 Prioleau Street
      Charleston, SC  29401
      Telephone:  (843) 720-7470

BY:   *S/Shaun C. Kent*
      SHAUN C. KENT
      Federal ID Number: 9326
      KENT LAW FIRM, LLC
      19 South Mill Street
      Post Office Box 117
      Manning, SC 29102
      Telephone:  (803) 433-5368

      ATTORNEYS FOR DEFENDANT

Charleston, South Carolina

February 13, 2017