IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO.: 2:16-cr-378 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -versus- | ) | |
| | ) | |
| MICHAEL THOMAS SLAGER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S MEMORANDUM FOR SENTENCING

Respectfully submitted,

BY:   *S/Andrew J. Savage, III*
      ANDREW J. SAVAGE, III
      Federal ID Number: 3734
      SAVAGE LAW FIRM
      15 Prioleau Street
      Charleston, SC  29401
      Telephone:  (843) 720-7470

BY:   *S/Donald L McCune, Jr.*
      DONALD L. McCUNE, JR.
      Federal ID Number: 11474
      SAVAGE LAW FIRM
      15 Prioleau Street
      Charleston, SC 29401
      Telephone: (843) 720-7470

      ATTORNEYS FOR DEFENDANT

Charleston, South Carolina
November 22, 2017.

<u>UNITED STATES OF AMERICA v. MICHAEL THOMAS SLAGER</u>

**Index for Defendant's Sentencing Memorandum**

**I.    MICHAEL THOMAS SLAGER**

    A.    Adoption of Pre-Sentence Investigation Report    2

    B.    Childhood    2 - 3

    C.    Adolescence    3 - 4

    D.    Military Service    4 - 5

    E.    Law Enforcement Career    5 - 8

    F.    Family    9 - 11

    G.    Split-Second Decision: Lifetime Consequences    11 - 17

**II.    LEGAL RESPONSE**

    A.    Cross Reference Computation    17 - 21

    B.    Voluntary Manslaughter is the Appropriate Cross Reference    21 - 23

    C.    Obstruction of Justice    23 - 29

    D.    Acceptance of Responsibility    30

    E.    Sentence Determination with Guideline Range    30 - 31

**III.    CONCLUSION**    31

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,  ) | CRIMINAL NO.: 2:16-cr-378 |
| ) | |
| Plaintiff,  ) | |
| ) | |
| -versus-  ) | |
| ) | |
| MICHAEL THOMAS SLAGER,  ) | |
| ) | |
| Defendant.  ) | |
| _____ ) | |

## **DEFENDANT'S MEMORANDUM FOR SENTENCING**

On May 2, 2017, former North Charleston Police Officer Michael Thomas Slager (Slager) appeared before this Court and admitted his guilt to the charge that he used excessive force while attempting to arrest Walter L. Scott (Scott).

For over two years, Federal and State authorities collaborated to convict Slager in their respective jurisdictions of crimes that would require Slager to spend the remainder of his life in prison.

State prosecutors were determined to convict Slager of Murder. Equally determined, Federal prosecutors sought a life sentence for Slager by charging him with multiple crimes including *inter alia* depriving Scott of his civil rights in violation of 18 U.S.C. § 242. The State exercised their authority first by bringing Slager to trial on October 31, 2016. On December 5, 2016, the jury announced that given the choice of verdicts, they were unable to reach a unanimous decision. A

1

mistrial was declared.  Interviews by the Solicitor, media and others revealed that the jurors were unanimous in their decision to acquit Slager of Murder, and although a majority favored acquittal, they could not reach unanimity on the lesser included charge of Manslaughter.

United States Probation Officer Kelli M. Frye (Frye) likewise made a determination that the Government's evidence against Slager did not support a finding of murder under Federal law.

Undeterred by the decision(s) made by trial jurors and an experienced and highly regarded probation officer, Federal prosecutors continue to this day their mendacious attempt to have this Court make a finding of murder if for no other reason than to accomplish their unreasonable goal to have Slager spend the remainder of his life in prison. They justify their advocacy with a disingenuous interpretation of the law[1] and  a false narrative of facts.

## MICHAEL THOMAS SLAGER

### Adoption of Pre-Sentence Investigation Report

Slager references Paragraphs 43 - 66 of his Presentence Report authored by U.S. Probation Officer Kelli M. Frye dated August 15, 2017, and revised on September 20, 2017.  Slager adopts those paragraphs of her report as if his own and includes them herein by reference.

### Childhood

Though a child of divorced parents, Slager never used his parents' relationship as an excuse for sub-par performance or behavior.  He was academically and socially successful throughout his

---

[1] *United States v. Warren*, 2013 WL 1962291 (E.D. LA. 2013), ECF # 713 at 6, signed by Jared Fishman, Trial Attorney, Civil Rights Division, United States Department of Justice.

primary and secondary education.  He maintained good  grades, was collegial to his classmates, impressed his teachers, and was often commended for his exemplary behavior.  Whether living with one parent or the other, with or without his sisters, Slager maintained a positive attitude.  Early in life he realized his goals for self-achievement were best realized through helping others.

## Adolescence

During his adolescent years, Slager lived with his Dad.  Just the two of them.  They drew close and formed a very special bond.  His father encouraged him to participate in community projects to help others.   Together they were active participants with Habitat for Humanity, constructing homes for the homeless and helping those in need.  That would become his path through life.

Slager later volunteered for a rescue squad.  He earned his EMT certificate.  Witnessing the frailty of life helped focus him on a career choice of public service.

Slager's father, Thomas Slager, writes[2]:

> **"From an early age Michael was always helping people.  As a young boy Michael would accompany me as a volunteer for Habitat for Humanity, building homes for the less fortunate.  His work ethic and enthusiasm were contagious to all who were involved."**

His sister, Claire, says in her letter to the Court:

> **"I learned some of the characteristics that I consider to be fundamental in my life from my brother Mike.  Mike taught me how important it is to be selfless.  Mike also showed me how important it is to never give up on something that is important to**

---

[2]All character letters with index are submitted to the Court as Exhibit A.

>you.  He is one of the kindest hearted, respectful, and empathetic men I have ever met."

>"He loved the feeling of being able to actually help people and make a difference during their worst times."  "His face would just light up when he would talk about how he was able to help someone."

Michael's aunt and uncle, Michael and Barbara Stinnett, say of Michael:

>"His aunt and I have always been proud of Michael and his desire to be of service to his community and have often portrayed him as a model for our own two sons, Michael's younger cousins."

## Military Service

When Slager was born, his Dad was an Army officer.  Slager believes that military service was in his DNA.  After high school and a brief time in college, Slager joined the United States Coast Guard.  Slager's self-discipline, service to others and other positive attributes were instilled in him by his Dad's example.

Retired Chief Warrant Officer Robert W. Almond  reflects on Slager's character in his letter to the Court:

>"Over the two years he worked for me, he exhibited nothing short of the Coast Guard's core values of honor, respect and devotion to duty.  Michael was a great worker that did everything asked of him.  I never had a single issue with his performance of duty or any other aspect of his role within our organization."

Retired Chief Warrant Officer Michael Jason Locke confirms Slager's dedication to duty:

>"Even though Michael did his official duty in an exemplary fashion, what impressed me the most about his service was his willingness to volunteer for the command's public outreach, whether it was volunteering to speak at a public school, give tours of his unit, or take part in a military funeral for a passing veteran, Michael was always one of the first to volunteer many times during his time off."

After five years, he received an honorable discharge. His DD-214[3] documents the following medals and ribbons:

| | | | |
|---|---|---|---|
| 1. | Good Conduct Medal | 6. | Presidential Unit Citation |
| 2. | Coast Guard Merit | 7. | Rifle Sharpshooter Ribbon |
| 3. | Unit Commendation | 8. | Special Ops Service Ribbon |
| 4. | Merit Team Commendation | 9. | Global War Terror Service Medal |
| 5. | Pistol Marksman Ribbon | 10. | The Coast Guard Achievement Medal[4] |

## Law Enforcement Career

Upon discharge, at the urging of a shipmate, Slager moved to North Charleston, and in January of 2009, he joined the North Charleston Police Department.

Assigned to the patrol division, Slager worked in the toughest crime-ridden areas of a crime-ridden city. North Charleston. A city known for violence. A perennial leader on a national list of the most dangerous cities in America.

Slager was known as a proactive police officer.[5] He enjoyed a reputation for being calm under stress, attentive, responsible, and always displaying a positive attitude. He was the one patrolman his colleagues depended on to intervene in a time of crisis. He was known for treating all citizens with dignity and respect. He had a reputation for using only minimal force and did so only when necessary. Prior to April 4, 2015, Slager had never used lethal force.[6]

Charlie Benton, Jr. knew Michael as a colleague working in the South Bureau. In his letter

---

[3]DD-214 attached as Exhibit B.

[4]Citation to Accompany the Award of the Coast Guard Achievement Medal attached as Exhibit C.

[5]Letter from Chief Zumalt attached as Exhibit D.

[6]NCPD Employee Performance Appraisals for Slager attached as Exhibit E.

to the Court, Benton tells a compelling story about Michael's interaction with a victim of a sexual assault:

> **"Within the first year of being a detective with the Special Victims Unit, I was assigned a case where the victim, a young black female, was drugged at a night club and then taken to a separate location where she was sexually assaulted.... At the direction of his sergeant, Mike was the initial responding officer and was specifically selected to respond to that call, ... because of his reputation for calmness and empathetic patience with highly traumatized victims. ...his sergeant recognized Mike's innate ability to construct highly detailed reports, a trait that is greatly esteemed by investigators who regularly receive reports from patrol officers. The investigation was active for months....**
>
> **In ... August of 2016, I met with the ... young black female to follow up on her case. During that meeting she began asking me about Mike.... She expressed great dismay at the media's portrayal of Mike as a malicious officer motivated by Mr. Scott's race. She then went on to tell me how she knew, from her own personal experience with Mike, that any implications that Mike's actions were in any way influenced by Mr. Scott's race were completely baseless. ... The victim's mother ... made a point of making sure I knew how highly they regard Mike for his character, attentiveness to the victim in her time of need, and the care with which he executed his duties."**

He goes on to say:

> **"I can confidently say that Mike's reputation indicates that he is a competent and measured officer who consistently performed in a just and fair manner."**

Benton testified at the State trial describing Slager's reputation as: "calm demeanor, level headed, honest officer, a truthful man."[7]

Benton's wife, Heather, submitted a letter to this Court:

> **"... the man we all perceive as calm, patient, purposeful, modest, meek, and generous truly is the reality of Mike. He genuinely**

---

[7]Refer to previously provided transcript, <u>State v. Slager</u>, November 29, 2016, pages 221 - 226.

> **cares about others, seeks to help those in need, pursues righteousness, and protects his family."**

She adds:

> **"He is a kind man who gives of his heart, his time, and his life to those in need. He sacrifices to do what's right even when its hard. He seeks to be a father and a husband and a good member of the community."**

Victor Buskirk was Slager's Lieutenant and says in his letter to the Court:

> **"During my time as his supervisor, I found him to have an easy going demeanor as well as a proactive instinct towards criminal activity. I completed numerous customer survey forms where Slager interacted with the community and I can't recall a single negative comment."**

Buskirk further states that Slager was selected to act as the bar inspector (an undesirable task due to its inherent problems related to politics and racial sensitivities) where he had to conduct nightly checks of the bars within his assigned area to ensure compliance with City Ordinances. Buskirk says:

> **"The decision to have Slager perform these checks was based on his maturity and ability to get along with the community." "Slager's demeanor and maturity enabled him to diffuse a potential heated encounter."**

Jason Dandridge, another North Charleston Police Officer, supports Slager's reputation for being unflappable:

> **"Michael was never known to be hostile towards anyone. He carried himself in a patient manner and would do what he was asked. I, nor anyone that I know of, ever heard Michael say anything derogatory towards any members of the community. I believe he served with pride and enjoyed serving the community."**

7

During the State trial, two of Slager's former supervisors, Charity Prosser and Darryl Allen, testified regarding their interaction with Slager. Prosser described Slager as a "dedicated officer," "level headed" and "brutally honest" and wrote on one of Slager's performance reviews "it was an honor to work with you." Prosser testified that "he had a way of just sort of putting people at ease and guiding them." [8]

Sgt. Allen, an African-American with 21 years of service with the North Charleston Police Department, was Slager's immediate supervisor when Slager was given the task of being the bar officer He testified that "he [Slager] was the kind of person who could bridge the gap." "He did an outstanding job."

When Allen was asked if he had an concern about racial animus or any discretionary practices on Slager's part, Allen testified "Just the opposite. He was praised in the community." He was "always level headed".[9]

Arrestees of Slager also praised him. Marilyn Harrison, who Slager arrested for Driving Under the Influence, wrote a letter of appreciation to Slager saying "I wanted to write this letter to thank you for saving my life." She goes on to say "...I am very thankful you saw me and tried to get me the help that I had needed." "...I thank God everyday for you, my life, and the wisdom to control my actions. Thank you."[10]

---

[8]Refer to previously provided transcript, State v. Slager, November 22, 2016, pages 226 - 234.

[9]Refer to previously provided transcript, State v. Slager, November 22, 2016, pages 234 - 243.

[10]Letter from Marilyn Harrison attached as Exhibit F.

8

## Family

At age 27, shortly after embarking on a new career with the North Charleston Police Department, Slager met his first true love. Jamie Batchelor was a friend of a friend. She was a bit older (30) and the sole provider for two children who were then ages six and eight. A year later when they married, Slager was working the midnight shift. He often filled his off duty time taking care of his children's needs. Car pools, recreation, and school work became a way of life. At home, Slager participated in all the hum-drum activities that came with home ownership.

Slager's step-son, Logan, writes to the Court the following:

> **"I remember when Mike would work two jobs so we could have the money to go on family vacations. I never had a family vacation until Mike came into my life. He would do anything for us.**
>
> **Mike makes my Mom very happy and that is important to me and my sister. Mike was there for me when I was growing up and it hurts me that Mike is not here for my brother Isaac."**

Bailey, Slager's step-daughter, writes:

> **"I have learned so much from Mike. I have learned the meaning of hard work and how to keep going even when you want to give up. There were times that I didn't want to finish raking the yard leaves or cleaning up around the house, but Mike helped me and it felt good to finish my chores."**

Slager's wife, Jamie, writes to the Court the following:

> **"Even still, I knew Mike was a great father because he already was in the role to his two step children that were not always the easiest. Up until April 4th 2015 Mike had not missed any school function or sporting event for either of my older children. When Mike was on Midnight shifts he would work all night and stay up and still manage to make it to any event the kids were having.**

9

> **When my son Logan was about to graduate from 5th grade, he and his best friend wanted to wear matching tuxedoes for his graduation and the dance. We definitely did not have money for the tuxedo rental, but Mike knew it was important for Logan in so many ways. Mike took 2 extra off duties, so he could pay for his tuxedo rental and also so we could take him out to dinner after the dance. Someone looking in may think that getting a 5th grader a tuxedo is silly, but Mike knew what the importance to Logan was.**
>
> **Logan's dad never showed up to his graduation even though he promised he would many times. Mike knew this could happen and wanted Logan to know than he could confide in, trust, love, and know Mike would do anything for Logan know matter how silly or trivial it may seem to others. It is this role that is still so important to Logan and his sister and now to our son Isaac. "**

Slager was settled and happy with only one desire unfulfilled: another child. Several attempts at in-vitro fertilization finally found success when Jamie's pregnancy was confirmed. Ecstatic with the knowledge that their son would be born in the spring of 2015, Slager asked to have his shift changed from midnight to day shift to enable him to spend more waking hours with Jamie and to help her prepare for the birth of their child.

Isaac was born on May 6, 2015, four weeks after his arrest. Slager was not present for Isaac's birth, baptism or his first Christmas. When Slager was finally released on bond, he and Isaac became inseparable. As his family reunited, the routines of old were rediscovered but there were new concerns. An attempt to burn down their home caused the family to move to a "secret location" and a change in schools. Michael used an alias - his wife's maiden name. Despite living in a new neighborhood, the children were exposed to hateful and racist graffiti. Fear was a constant companion. Slager and his wife worked ceaselessly to keep the children from hearing the vicious threats directed at their father. Without due process, Slager had been abandoned by his union and

10

fired by his employer. No income, no medical insurance. No therapy that he and his family desperately needed. The family was forced to rely on government assistance. With occasional assistance from Slager's father, food stamps and Medicaid, they managed. Life was minimalist but life was good. Much of Slager's time occupied preparing for the State trial. Hearings were plentiful, although outcomes along with uninformed media accounts, editorials, and politicians' self-serving proclamations brought on a dark cloud of depression. Therapy consisted of working daily with his legal team including several experts who gave him hope.

Following the State trial, Slager, despite the urging of his family, friends and others, decided to formally accept responsibility for unlawfully contributing to the death of Scott. He would have done so earlier, but the State's continuous demand for life imprisonment left him little choice.

Slager was surprised by the Government's insistence that he be immediately incarcerated following his plea. There were no incidents that caused any concern since his release 16 months earlier on State and Federal bonds. Although the Government's demand seemed to be arbitrary, Slager accepted it without protest knowing that every day he remains incarcerated means he is one day closer to going home.

## Split Second Decision: Life Time Consequences

Before daylight on the morning of April 4, 2015, the day before Easter, Slager dressed in his North Charleston issued police uniform, kissed his two sleeping children, embraced Jamie and headed to roll call.

The morning shift started very routinely. Slager and his partner Clarence Habersham, an African-American who attended college on a football scholarship, had an unusually close

11

relationship. Habersham and Slager, without request, always backed each other up no matter how insignificant the incident.

North Charleston is divided geographically into three police bureaus - North, Central and South. Each has its own patrol personnel and other law enforcement functions assigned. Bureaus are divided into zones. Patrol assignments within zones are made on the basis of an area's criminal history.

Slager's Sargent took the day off to work a part time job, and three of the six Central patrolmen were also absent. Barely 50% of the assigned patrolmen in the City were working that day. Just after 9:30 a.m., Slager stopped a vehicle for a minor safety violation, an inoperable tail light. It was a classic safety stop, the kind that rarely resulted in a citation.[11]

Slager, in accordance with protocol, advised dispatch. Although he was operating on a bureau-wide communication channel, Slager was unaware that Habersham was otherwise occupied. He later learned that Habersham had been assigned (outside the chain of command) to serve a bench warrant on an inmate who was in custody at the county jail for failure to complete payment for a Municipal fine.

As Slager approached the vehicle operated by Scott, he first noticed the presence of a passenger. The passenger did not acknowledge Slager. Scott appeared confused about the ownership of the vehicle and its insurance coverage. Concerned by Scott's conflicting statements, Slager returned to his vehicle to enter Scott's license and vehicle registration data into his in-car computer. Scott opened his car door, exited his vehicle, and signaled to Slager. He returned to his

---

[11]Summary Analysis of Tickets and Warning Issued by Officer Slager attached as Exhibit G.

vehicle when admonished by Slager. Seconds later, Scott again opened his car door, and without further communication, exited his vehicle and ran with a sense of urgency. Surprised and suspicious about why someone would run from a stop for a minor safety violation, Slager intuitively pursued Scott in an attempt to stop him. Although North Charleston did not have a policy regarding foot chases, Slager immediately contacted Dispatch giving a description of Scott's clothing, location and direction. He repeatedly ordered Scott to stop. After 100 yards, Scott changed direction and then entered an abandoned trailer park. Slager warned Scott that if he did not stop, he would use his Taser. Scott offered no response and kept running. Slager fired his Taser, but he missed, and the chase continued. While in pursuit, Slager heard Scott shouting his location into his cell phone. Slager issued more commands and warnings, again without acknowledgment. The only response made by Scott was: "Fuck the police." He expressed no physical or verbal sign of compliance. A second Taser discharge resulted in one prong penetrating Scott's left flank. A second prong was never located. Scott fell immediately thereafter.[12]

Slager approached Scott and attempted to detain him by placing handcuffs on him. Scott, who was on the ground, resisted. Slager was unsuccessful in his efforts to handcuff him.

With growing fear, and without knowing anything about Scott or why he was so violently resisting detainment for a minor offense, Slager realized he was unable to control Scott. He called for Habersham to "step it up." This call was described by Habersham in his State trial testimony:

**"Q.    ... one of those communications ... from Mr. Slager, .. was personal to you?**

**A.    Yes, sir.**

**Q.    Tell us your ... thought[s] at the time you [heard] that communication.**

---

[12]A later examination determined that the electrical current was insufficient to cause a muscular reaction in Scott. Report of Darko Babic, M.S. attached as Exhibit H.

A.    During the chase when he said 156, step it up, I kind of – the hairs on the back of my neck stood up a little bit, not normally unless somebody is in a high stress situation they call our a certain number or a name on the radio to tell them to hurry up, normally it's hurry up, step it up, but normally when an officer is in a high stress situation they refer to calling certain people out to help them in – help them out."... He was in a physical altercation.[13]

As Slager keyed his microphone with his right hand to call for assistance, Scott took advantage of Slager having only one hand available, and he grabbed Slager's Taser and ripped it from his control.[14]

Slager managed to separate himself from Scott and regain a standing position. Scott, still in possession of the Taser, turned in the direction of Slager and attempted to tase him. Slager instinctively reacted by attempting to disarm Scott, striking his right hand while simultaneously reaching for his firearm. Unbeknownst to Slager, the Taser fell behind him as he reached for his weapon. His level of fear continued to escalate as frightening thoughts raced through his mind:

> He has my taser; He will use it to stun me; hile stunned he will take
> by weapon; Why is he doing this; Why is he so aggressive; This was
> a minor safety stop; Who was he talking to and giving directions to
> on his cell phone; Where is the passenger; I did not have a chance to
> frisk him; He must have a weapon or he would not be acting so bold;
> Where is my partner; Where are other officers

---

[13]Refer to previously provided transcript, State v. Slager, November 7, 2016, page 29, lines 6 - 18.

[14]The frequency of the recorded time of the Taser firings taken from the Taser download underpins Slager's account of the events that transpired. Report of Taser Firing of April 4, 2015, attached as Exhibit I.

Less than 1 ½ seconds following physical contact between Slager and Scott, Slager fired his weapon. Slager continued to fire until Scott fell down. From the time that Scott left his vehicle until the time he fell, he gave no verbal or physical indication of compliance or surrender.

Within six seconds, Slager notified dispatch that: "Shots fired, subject is down, he grabbed my Taser." In accordance with his training, Slager handcuffed Scott before securing his Taser. He promptly returned to the area where Scott was laying and, in the presence of Habersham, placed it on the ground. Less than a half minute later, Slager picked up the Taser and holstered it.

On scene and in the presence of others, Slager provided his Sargent, Lieutenant and Chief three separate debriefings. All statements were consistent with each other and the evidence later discovered. Slager demonstrated to the North Charleston Police Chief shortly after the incident[15] how Scott took control of the Taser, causing a ripping injury to Slager's finger, before pressing the Taser against Slager.[16]

Two days later a video was produced by attorneys representing a bystander. A copy was provided to the media and to State investigators. The investigators and State prosecutors reviewed the video and made a determination to charge Slager with Murder. Prior to his arrest, Slager provided a more extensive statement which was consistent with other statements. Failing to abide by basic interrogation protocol, no video or audio recording was made. Slager was not asked to initial or sign the investigator's notes, nor was he asked to provide a written statement. His own attorney took no notes.

---

[15]Statements attached as Exhibit J.

[16]Report of examination of Slager's uniform by John Paolucci and report by SLED Trace Analyst Megan Fletcher attached as Exhibit K.

15

Slager was arrested for Murder on April 7, 2015, and later indicted by the Charleston County Grand Jury on June 8, 2016.

On October 31, 2016, the State trial began. Federal Agents and Federal prosecutors were in attendance every day just as they had been during all pretrial hearings. Federal agents and prosecutors worked hand-in-hand with State law enforcement and prosecutors interviewing witnesses, discussing timing and strategy. State and Federal prosecutors collaborated in an effort to obtain Slager's conviction.

After the State trial, jurors were summoned by the Solicitor to explain their unanimous final decision to acquit Slager of Murder and their failure to convict Slager of Manslaughter.

Four of those jurors have written letters to this Court:

Juror #521 says in the letter to the Court:

> **"I believe with all my heart that Michael Slager is a good man who made an honest mistake - a mistake he will have to live with every day for the rest of his life."**

Juror #61 says in the letter to the Court:

> **"Having sat through over 5 weeks of testimony I feel like I have a better picture than most of this matter. I do not believe that Michael Slager intended in any way shape or form to cause the death of Walter Scott. It is my opinion that this was a simple traffic violation that went in a horribly wrong direction by a series of events that started with Walter Scott running away from the officer."**

> **"Officer Slager did not set out to harm that day and I do believe that he cared deeply about the people and the area he patrolled."**

Juror #404 says in the letter to the Court:

> **"I do not believe Mr. Slager acted with any malice or ill will that day. I believe that he absolutely feared for his own life. His**

16

**actions were appropriate for the circumstances and his training as a police officer. His own testimony and the testimonies of his fellow officers and supervisors give me every reason to believe he was a good officer doing his job and the outcome of that day was sad and unfortunate to say the least."**

Juror #499 says in the letter to the Court:

**"I know that everyone that has seen the video was shocked by Slager's action. I was too when I viewed it on TV. It is a completely different story when you've listened to all the facts, when you know there was a struggle before the camera started filming. While I will agree that police abuse does exist and should be stopped, Slager is clearly not in that group. Michael Slager was always courteous, never cursed and never uttered a racial slur. I truly believe these events got out of hand and due to the fact that Slager was outsized, had no backup from NCPD and Scott was disobeying his orders, Slager made a split second decision under a pressurized situation. A decision that Michael Slager now deeply regrets but unfortunately cannot undo.**

## LEGAL RESPONSE

### Cross Reference Computation

A Presentence Investigation Report (PSR) was completed in this matter. The charged conduct is a violation of 18 U.S.C. § 242, Violation of Civil Rights. The PSR correctly applied Voluntary Manslaughter as the cross-reference the underlying offense, with a Base Offense Level (BOL) of 29. The PSR went on to add six levels because the act was committed under the color of law, bringing the offense level to 35. Because the DOJ has agreed that Slager has earned a three-level reduction for acceptance of responsibility, that offense level was reduced to 32. The sentencing range computed in the final PSR accurately reflects an offense level (prior to any departures or variances) as 32. Because Slager has never committed another local, state, or federal offense, his

Criminal History Category is 1. Thus, the PSR correctly computed the Guideline Range (unadjusted for departures or variances) at 121-151 months.

The DOJ contends that Slager acted with malice in this incident, and thereby is subject to the second-degree murder cross reference. To reach this conclusion, the DOJ invites the court to draw inferences from cobbled together from case law, from their version of the facts, and from language in the plea agreement to conclude whether malice existed or not. However, "[w]hether malice is present or absent must be inferred by the [trier-of-fact] from the whole facts and circumstances surrounding the killing." *United States v. Fleming*, 739 F.2d 945, 947 (4th Cir. 1984).

The statutes underlying the cross reference dispute are 18 U.S.C. § 1111 and 18 U.S.C. § 1112. These statutes are to be interpreted in accordance with their common law meaning. *See United States v. Chase*, 18 F. 3d 1166, 1170 (4th Cir. 1994)(citation omitted). At common law, what might have been murder can be transformed into voluntary manslaughter if the act were done on adequate provocation or heat of passion. "The usual view of voluntary manslaughter . . . presupposes an intent to kill (or perhaps an intent to do serious injury or to engage in very reckless conduct), holding that in spite of the existence of this bad intent the circumstances may reduce the homicide to manslaughter." Wayne R. LaFave, *Criminal Law* §15.2(a) (5th ed. 2010). Importantly, "[u]nder federal law, voluntary manslaughter is distinguishable from murder by the element that the killing was done upon a sudden quarrel or heat of passion, the existence of which effectively excludes the malice aforethought element of first and second degree murder as the statute provides." *United States v. Tisdale*, 1993 WL 359483 at 2 (4th Cir. 1993)(unpublished opinion, quoting *United States v. Scafe*, 822 F.2d 928, 932(10th Cir. 1987)). Adequate provocation or heat of passion mitigates what might otherwise be first or second degree murder to voluntary manslaughter.

18

As such, inferential or *ipse dixit* declaration of malice from circumstances surrounding the event can never conclusively preclude a finding of voluntary manslaughter. On the contrary, one must consider whether there is some excuse or justification for the actions. In this case, the DOJ contends that the proper cross-reference is 18 U.S.C. § 1111, the statute defining murder. The statute contains no *mens rea* requirement. Rather, as noted above, "the federal statute simply declares the language of the common-law offense, and so when the defendant, without legal justification but actuated by a sudden passion of fear or rage arising from attendant circumstances that would provoke such passion in an ordinary person, kills intentionally (or with one of the other mental states that constitutes malice), the killing is nevertheless deemed to be in the *absence of malice* under the federal statute." *United States v. Browner*, 889 F.2d 549, 552 (5th Cir. 1989) (emphasis in original).

To summarize, in the federal scheme, the mental state that may normally indicate malice can be negated by other circumstances. Among those circumstances are provocation or heat of passion. Thus, even a willful or intentional act done under provocation or heat of passion will reduce a murder to voluntary manslaughter. To determine otherwise would prevent a voluntary manslaughter verdict when the charged offense is a violation of 18 U.S.C. § 242, which requires a willful mental state. This is obviously not the case - violations of 18 U.S.C. § 242 can commonly be accompanied by consistent verdicts of voluntary manslaughter. *See, e.g.*, *United States v. Velazquez*, 246 F. 3d 204 (2d Cir. 2001)(remanding the case to determine whether trial judge found adequate provocation); *United States v. Moore*, 708 F. 3d 639 (5th Cir. 2013)(sentence of voluntary manslaughter as underlying offense in violation of 18 U.S.C. § 242 is proper); *United States v. Warren*, 2013 WL 1962291 (E.D. LA. 2013) (no inconsistency between verdict of violation of 18 U.S.C. § 242 and voluntary manslaughter). As cogently argued in *Warren*, "[s]imply put, voluntary manslaughter, like murder is an intentional killing without legal justification, however, common law

19

provided for a reduced penalty for such action under circumstances such as the 'heat of passion,'

because such circumstances undercut the traditional understanding of 'malice.'"[17]    This

understanding of the relationship between malice, manslaughter, and willfulness has also been

addressed by the 10th Circuit Court of Appeals.

> Malice is not satisfied simply by killing with an intentional or reckless mental state; instead, malice specifically requires committing the wrongful act without justification, excuse, or mitigation. *See* 50 *Am.Jur.2d Homicide § 37* (1999) ("[Malice] is said to include all those states and conditions of mind which accompany a homicide committed *without legal excuse or extenuation.*") (emphasis added); *Black's Law Dictionary* 976 (8[th] ed.2004) (defining "malice" as "intent, *without justification or excuse*, to commit a wrongful act") (emphasis added); 40 *C.J.S. Homicide § 33* (1991) ("Malice has been defined as consisting of the intentional doing of a wrongful act toward another *without legal justification, excuse, or mitigation.*") (emphasis added). The Supreme Court has also described malice as "lack of provocation." *Patterson v. New York*, 432 U.S. 197, 216, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977).

*United States v. Serawop*, 410 F.3d 656, 664 (10th Cir. 2005).

In fact, during the state case on which this prosecution is based, jurors overheard five weeks

of testimony regarding the shooting. The jury instructions presented the triers-of-fact a choice of

convicting Slager for murder or for voluntary manslaughter. Finding no malice, the jury rejected the

murder charge unanimously. This was explained by the foreperson of the jury, Dorsey Montgomery.

"What Michael Slager did wasn't malicious,' he said. "It would be voluntary manslaughter based

on the law." *Michael Slager Foreman Says Deadlock Was a Myth*, Ebony, December 9, 2016,

(accessed at http://www.ebony.com/news-now/slager-jury-foreman–walter-scott#axzz4z66Txx7M)

---

[17]ECF #713 at 6, signed by Jared Fishman, Trial Attorney, Civil Rights Division, United States Department of Justice.

(last visited November 21, 2017).  Neither could the jury reach a decision on manslaughter charges, with two jurors voting for acquittal, five leaning toward conviction on manslaughter and five leaning towards acquittal.  The upshot of this is that when the underlying facts were put in front of a jury, they determined that the malice was excused by heat of passion induced by fear.

As will be demonstrated, there was adequate provocation caused by the resistance of Scott to Slager's lawful commands and attempt to arrest him.  Because the malice was mitigated by provocation and the ensuing fear, the proper cross-reference for the offense is contained in the PSR, that is, voluntary manslaughter.

### Voluntary Manslaughter Is the Appropriate Cross Reference

The evidence in this matter appropriately establishes that voluntary manslaughter is the appropriate cross-reference.  A homicide that occurs due to the heat of passion is considered a voluntary manslaughter.  "Heat of passion" is a term of art describing a disturbance to the ability to think rationally that is brought on by strong feelings, including feelings of fear.  "[V]oluntary manslaughter emerged as an intentional killing that is nonetheless deemed to be without malice because it occurs in what the courts called 'the heat of passion,' a passion of fear or rage in which the defendant loses his normal self-control as a result of circumstances that would provoke such a passion in an ordinary person, but which did not justify the use of deadly force." *Browner*, 889 F.2d at 552 (5th Cir. 1989)

Such provocation existed in this matter.  Slager was the only officer on the street the day when he pulled over Scott's car for a traffic violation.  He was patrolling Charleston Farms, a high crime or Compstat neighborhood, singled out for special attention because of the number and serious nature of crimes committed there.  Normally, his partner Officer Clarence Habersham would have

been patrolling that area too, but he was sent on non-operational tasking to deliver a warrant to a person in the Al Cannon Detention Center. During Slager's initial encounter with Scott, he saw that Scott was accompanied by a passenger who would not look at Slager at all during the traffic stop. Scott told an ever-changing story about whether he owned or was buying the vehicle he was driving, and he could not provide registration or proof of insurance for the vehicle.

After going back to his patrol car to run Scott's license, Slager saw Scott bolt from the car and begin running. Scott failed to obey Slager's lawful orders, and continued to run when warned that the Taser would be deployed against him if he did not stop. While Scott was fleeing, he was talking to someone on the telephone, apparently broadcasting his position to a third-party unknown to Slager, raising Slager's suspicion.

Once on the ground, Scott continued to resist Slager, and eventually wrested Slager's Taser away from him. This happened just as Slager was broadcasting to his partner to "step it up" to assist Slager in subduing Scott. Officer Habersham said that the sound of Slager's voice was telling, and indicated Slager was in danger. In fact, he said "the hairs on the back of my neck stood up" when he heard it. State of South Carolina v. Slager, November 17, 2016, 29:9-18. By this point, Slager had run some two hundred yards in full gear, deployed his Taser in probe mode twice, attempted to subdue Scott with his Taser in drive-stun mode, and had wrestled on the ground with Scott enough that Taser wire was wrapped around his forearm and hand.[18]

When they got up from the ground (according to the only witness, Scott got up aggressively)[19] Slager warned Scott to drop the Taser or he would shoot him. 1.49 seconds after

---

[18]Still frame from Imel's enhanced video attached as Exhibit L.

[19] South Carolina v. Slager, November 4, 2016, 127:2-5.

being toe-to-toe with Scott, Slager fired his first round. At that point, he did not know if Scott was armed; he had no backup on scene; he was exhausted from the chase and the ground fight; and, he was unsure of the location of the passenger in the vehicle or the person that Scott was talking to on the phone. Slager eventually fired eight shots at Scott, with each shot being fired approximately .3 to .4 seconds apart. When Scott fell to the ground, Slager quit firing. He had seven rounds left in his weapon. Slager immediately announced on the dispatch radio, "Shots fired, subject is down, he grabbed my Taser." That provocation by Scott and fear experienced by Slager are the hallmarks of the "heat of passion" that incited Slager.

Therefore, the PSR correctly named voluntary manslaughter as the cross reference offense. This was not murder, because of the absence of malice which was vitiated by provocation. The voluntary manslaughter guideline accurately and adequately describes the underlying conduct, and the PSR determination need to be revisited.

### Obstruction of Justice

The DOJ asserts that Slager's conduct warrants an application of a sentencing enhancement for obstruction of justice. This enhancement, found at U.S.S.G. § 3C1.1, provides:

**§3C1.1.**    **Obstruction or Impeding the Administration of Justice**

> If (2) defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by **2** levels.

*U.S. Sentencing Guidelines Manual* § 3C1.1 (U.S. Sentencing Comm'n 2014)(*hereinafter* USSG). The guideline has application notes that provide examples of conduct that qualify as obstruction, as well as examples of conduct that do not normally constitute obstruction. Because Slager's conduct did not fall within the conduct proscribed by this section, an enhancement is neither proper nor warranted.

The DOJ claims Slager obstructed justice by tampering with the crime scene, misleading his colleagues in law enforcement, lying to state investigators, providing false testimony under oath at a state court proceeding; and perjuring himself at a federal court proceeding. ECF #127 p.19. Each of these contentions is incorrect and will be addressed individually.

## Slager Did Not Tamper with the Crime Scene

The DOJ alleges that Slager moved his Taser to obstruct the investigation into the incident. In so doing, the DOJ compares Slager's behavior to a suspect throwing away drugs during a chase or hiding a gun during an investigation. These metaphors are inapt for several reasons which will be discussed below. The DOJ makes much out of Slager's admission that Scott did not have the Taser when Slager fired his weapon, and that Scott was unarmed when he was running away. These are facts admitted by Slager now, but unknown to Slager at the time of the incident.

Following the shooting, Slager handcuffed Scott and then scanned the horizon behind him, the likely location that the passenger in the car would have approached if he were joining the pursuit. Slager spotted his Taser on the ground. In order to secure the crime scene, Slager picked up the Taser and brought it to where Officer Habersham was attending to Scott. He dropped the Taser on the ground beside Habersham for a brief period (less than 30 seconds) and then reholstered the weapon. It was recovered from Slager by SLED agents during the course of their investigation.

24

The enhanced video shows the Taser bouncing down the road milliseconds before the first shot is fired, and the Taser came to rest behind where the shots were fired. SLED Agent Peterson's Memorandum of Interview indicates that Slager told the SLED investigators that he grabbed the Taser and holstered it because he did not know who might be coming to help Scott, and that he didn't want to leave a weapon unsecured. (Peterson MOI 4/7/2016, R5 SAW 52). Though Slager did drop the Taser briefly by Officer Habersham, he reholstered it within a short amount of time. Habersham testified that he never saw the Taser. Had Slager wanted to obstruct justice, he could have placed the Taser on or near Scott's body before any other officers arrived. He did not do so - instead, he reholstered it. Slager's action at the crime scene did not constitute obstruction of justice. Rather, he picked up the weapon to secure the scene.

### Slager Did Not Lie about His Conduct

The DOJ contends that Slager lied about his conduct for over two years and concocted a story that he was attacked by Scott. Apparently, the DOJ classifies a lie as anything that is inconsistent with their version of the story. Slager gave statements to his supervisors at the scene, gave a statement to SLED investigators on April 7, 2015, and has testified on his own behalf on several occasions since then. To reach the conclusion that Slager was consistently lying, the DOJ ignores guidance in the obstruction enhancement and the science behind the effect of traumatic events on memory. Because they deliberately chose to ignore these factors, the DOJ charges are both false and misleading.

As a starting point, memory formation, retention, and recall is affected by many factors. The South Carolina Criminal Justice Academy (SCCJA) curriculum contains information relating to memory performance under pressure. The students are taught that under periods of high stress, there

are both perception degradations (e.g. tunnel vision, loss of ability to focus, loss of depth perception) and cognitive degradations (critical incident amnesia). SCCJA Use of Force Curriculum, R5 SAW 1667-68. The obstruction application notes themselves contain an important caveat - "[i]n applying this provision in respect to alleged false testimony or statements by defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." U.S.S.G.§3C1.1, app. note 4 (2014).

Slager presented expert testimony from Dr. Andy Morgan, a forensic psychiatrist, who has studied the effects of stress on cognition. Morgan's research subjects for this field include SERE (Survival, Evasion, Resistance and Escape) students, military members from the special forces of the United States. This research is notable because it is done contemporaneously with high stress training where students have a fear of (and some unfortunately suffer) death in the process. Morgan testified that high stress is debilitating to memory; that high stress interferes with the process of transforming short term to long term memory; and that when this interference occurs, memory will not substantially improve over time. South Carolina v. Slager, 11-29-2016, 152:24-153:21.

Morgan also emphasized that when you recall a memory, it is not like picking a file out of a file cabinet; rather, the memory is re-created when recalled, and it is shaped by your mood at the time and supplemented by any new information you have received in the meantime. He emphasizes that memory is dynamic, and not static, and that it is fragile early on. In a danger, fear, or fight or flight situation, the chemistry affecting the brain that helps us survive also disrupts the memory, interferes with the ability to absorb additional information, and to recall that information. *Id.* at 153:22-154:12. He opined that high stress disrupts memory and that sometimes the memories

26

simply cannot be recovered. In fact, a symptom of post-traumatic stress disorder is an inability to remember critical details. *Id.* at 159:7 - 160:4.

Finally, Morgan testified that after a high stress event it takes fifteen to thirty minutes to regain the executive (i.e. reasoning) function of the brain. If one has a perfect recollection of events that happened under stress, Dr. Morgan attributes that to having someone fill in the blanks. A Swiss cheese memory is a symptom of stress, and not an indicator of lying. A perfectly cohesive story well remembered would be more indicative of prevarication. *Id.* at 161:15-163:18.

In sum, memory is not static, and memory created under stress has many holes. These holes are eventually filled in, usually by outside information that is incorporated when the memory is recreated. A lack of knowledge on a particular subject does not indicate that the subject is lying; neither does an ability to recall certain things not simultaneously recorded in the memory.

To illustrate that Dr. Morgan's testimony describes a normal human condition, the transcript of United States Attorney General Jefferson Beauregard Sessions before the House Judiciary Committee on November 14, 2017, is instructive. Unlike Slager, who had been in what he perceived a life and death struggle before he made his statements, Sessions had time to prepare for his Congressional testimony, yet still often got it wrong. Why? According to Sessions, he was working in chaotic conditions created by the Trump campaign. This was undoubtedly stressful, though not as stressful as having shot a man to death, or dealing with the aftermath of that, or facing the death penalty or life in prison. As Sessions made clear in his statement, a failure to recall, or an inaccurate recollection, does not a liar make.

27

The text below reflects the sworn testimony of Sessions in his opening remarks. The highlighted portions are particularly apropos to describe memory's imperfections, and in fact, could have been spoken by Slager himself.

**Lastly, I would like to address the false charges made about my previous testimony. My answers have not changed. I've always told the truth and I have answered every question as I understood them to the best of my recollection as I will continue to do today.** I would like to address recent news reports regarding meetings during the campaign, attended by Joyce Papadopoulos and Carter Page, among others.

**Frankly, I had no recollection of this meeting until I saw these news report. I do now recall that the March 2016 meeting at the Trump Hotel that Mr. Papadopoulos attended, but I've no clear recollection of the details of what he said at that meeting.**

After reading his account and to the best of my recollection, I believe that I wanted to make clear to him that he would not authorize to represent the campaign with the Russian government or any other foreign government for that matter.

**But I did not recall this event which occurred 18 months before my testimony of a few weeks ago and I would gladly have reported it had I remembered it** because I pushed back against his suggestion that I thought may have been improper.

**As for Mr. Page, while I do not challenge his recollection, I have no memory of his presence at a dinner at the Capitol Hill Club or any passing conversation he may have had with me as he left the dinner.** All of you have been in campaigns, let me just suggest, but most of you have not been displayed in a presidential campaign and none of you had a part in the Trump campaign.

And it was a brilliant campaign, I think, in many ways, but **it was a form of chaos every day from day one**. We traveled some times to several places in one day. Sleep was in short supply and I was still a

full-time Senator at a very – with a very full schedule.  During this year, I've spend close to 20 hours testifying before Congress – before today.

**I have been asked to remember details from a year ago, such as who I saw on what day, in what meeting and who said what to when?  In all of my testimony, I can only do my best to answer your questions as I understand them and to the best of my memory.  But I will not accept, and reject accusations, that I have ever lied.  That is a lie.  Let me be clear, I have, at all times, conducted myself honorably and in a manner consistent with the high standards and responsibilities** of the Office of Attorney General which I revere.  I spent 15 years in that department.  I love that department.  I honor that department and will do my dead-level best to be worthy of your attorney general.  **As I said before, my story has never changed.  I've always told the truth and I've answered every question to the best of my recollection and I will continue to do so today.**

Oversight of the Department of Justice: Hearing Before the H. Comm. On the Judiciary, 115th Cong.(2017) (statement of the Hon. Jefferson Beauregard Sessions, United States Attorney General)(accessed at http://www.cnn.com/TRANSCRIPTS/1711/14/cnr.04.html)(last visited on November 21, 2017).

Like Sessions, Slager never lied or misled anyone.  Like Sessions, he answered the questions that were asked.  When he had his memory refreshed, he added the refreshed recollection to his testimony.  When he failed to remember certain items, it can be attributed to the stress or the chaos of the event during which the memory should have been formed.  Like Sessions, Slager's testimony has always been consistent with the memory he had at the time and he has responded to questions asked in the context of the Questions.[20]

---

[20]The DOJ seems particularly aggrieved that at pretrial hearings held on April 21 and April 24, 2017, Slager, on the advice of his attorney, would only answer questions about what he told SLED agents two years earlier if he actually recalled what he told them.  Contrary to DOJ's contention, that is not obstructing justice - that is telling the truth.

**Acceptance of Responsibility**

The DOJ threatens to withdraw the three-level reduction in base offense level for acceptance of responsibility pursuant to U.S.S.G. §3E1.1.   Slager has accepted responsibility for the act.  He has said nothing that contradicts the factual basis for the offense contained in the plea agreement. He continues to tell his story, and that story is consistent with the factual basis.  He also advocates for the law to be applied in a fair and impartial manner.  To intimate that his action represents "conduct inconsistent with acceptance of responsibility" is to imply that Slager has to accept from the DOJ their cramped, uninformed, and stilted version of the events of that day.  That is simply not the case.  As the plea agreement makes clear, the parties reserved the right to bring additional facts to the attention of the  Court.  ECF # 114, para. 4, p. 2.  The fact that the DOJ disagrees with those facts is not a basis to withhold the acceptance of responsibility adjustment.

**Sentence Determination Within the Guideline Range**

Specific Offender Characteristics found in Part H of the U.S.S.G. provide guidance on the use of specific offender characteristics.  Those that the Court may find applicable apply to Slager include:

| | |
|---|---|
| 5H1.5 | Employment record |
| 5H1.6 | Family Ties and Responsibilities |
| 5H1.8 | Criminal History |
| 5H1.11 | Military, Civic, Charitable, or Public Service; Employment-Related Contributions; Record of Prior Good Works |

Based on the foregoing review of Slager's character traits, this Court is encouraged to take into account:

      1.    5H1.5

      2.    5H1.6

      3.    5H1.8

      4.    5H1.11

All cited characteristics and Slager's criminal history should be considered for determining Slager's sentence within the applicable guideline range.  The Court's consideration is endorsed in the commentary to Part H of the U.S.S.G.

## CONCLUSION

Before consideration is given to Slager's 5K2.10 U.S.S.G. motion for departure, the Court should endorse the Probation Officer's finding that total offense level of 32 is warranted.

Respectfully submitted,

BY:   *S/Andrew J. Savage, III*

ANDREW J. SAVAGE, III
Federal ID Number: 3734
SAVAGE LAW FIRM
15 Prioleau Street
Charleston, SC  29401
Telephone:  (843) 720-7470

BY:  *S/Donald L McCune, Jr.*

DONALD L. McCUNE, JR.
Federal ID Number: 11474
SAVAGE LAW FIRM
15 Prioleau Street
Charleston, SC 29401
Telephone: (843) 720-7470

ATTORNEYS  FOR  DEFENDANT

Charleston, South Carolina

November 22, 2017