IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO.: 2:16-cr-378 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -versus- | ) | |
| | ) | |
| MICHAEL THOMAS SLAGER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## MOTION FOR DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. §5K2.10 AND NOTICE OF GROUNDS FOR VARIANCE

Michael Slager, by and through his attorney Andrew J. Savage, III, hereby moves this Court to grant a downward departure in this sentencing pursuant to U.S.S.G. §5K2.10. The following information is presented in support of this request.

## FACTS

On April 4, 2015, Michael Slager was working as a police officer for the North Charleston Police Department. In that capacity, he initiated a traffic stop on a vehicle that had an inoperative third brake light.[1] After initiating the stop, he approached the vehicle to address the driver, Walter Scott. Mr. Scott was seated in the vehicle along with a companion, Pierre

---

[1] For a compilation and timeline of the events as captured by patrol car dash cam, Slager's body microphone and consolidated dispatch tapes, *see* Exhibit 1.

1

Fulton.  During the initial interview, Slager addressed Scott from the driver's door. Slager asked for the vehicle registration and proof of insurance coverage, which Scott could not produce. When queried, Scott gave conflicting stories regarding the ownership of the vehicle he was driving.  Slager took Scott's license and returned to his own vehicle to check the status of Scott's license in the computer database.

Before Slager had a chance to complete the check, Scott exited the vehicle and stood. Slager told him to return to the vehicle, and Scott complied.  Shortly thereafter, Scott again exited the vehicle and started running from the scene.  Slager pursued him.  During the foot chase, Slager twice warned Scott to stop or that he would deploy his Taser.  After each warning, Scott continued to run.  Neither Taser shot (done in the probe mode) was effective.  Nonetheless, after a chase on foot of approximately 200 yards, and shortly after the second ineffective Taser shot, Scott went down to the ground.  Slager approached Scott in an attempt to gain control over him.

It is important to note that the neighborhood that Slager was patrolling was a designated Compstat area, that is, an area with a history of high crime rates that is targeted for focused additional police coverage.  Likewise, it is important to note that the day of the incident, Slager was essentially alone patrolling the streets in his assigned geographic bureau.  His supervisor was on leave, and of the seven other officers assigned to that shift, only three were available for duty.  Slager was performing the traffic stop; Ptl. Banias was retrieving a laptop that had been mistakenly left in a rental car; and Ptl. Habersham was serving a warrant on an inmate at the Charleston County Detention Center (who unknown to Habersham and presumably unknown to dispatch had already been released).

During the foot chase, Slager broadcast his location and the fact of the chase on the dispatch radio to notify dispatch and other officers of the situation. Likewise, Scott had been broadcasting his location to an individual unknown to Slager on a cell phone that Scott carried during the chase. When Scott went to the ground, Slager heard a voice telling Scott to cooperate with the police. Slager presumed that he was being joined by one of his fellow officers admonishing Scott – he later learned that the voice was that of Scott's mother coming from Scott's cell phone urging him to cooperate with the police.

Cooperation was not part of Scott's plan. He continued to struggle as Slager tried to handcuff him. Slager attempted to use his Taser in the "drive-stun" mode to gain compliance with his commands, but Scott was not deterred. In fact, he continued to resist. After a 200-yard chase and a struggle on the ground, Slager was winded and frightened. He was attempting to pin Scott down with his left elbow, while reaching for his dispatch microphone to call for responding officers to "step it up," when Scott wrested the Taser from Slager.

Scott turned the Taser around and pointed it at Slager. Slager was losing the fight on the ground. His forearm was wrapped in Taser wire, he had cuts and contusions, had been mounted by Scott who had gained control of his Taser, and he was in fear for his life. Both men managed to stand up, and Slager made one last attempt to get the Taser back from Scott. As they arose, they were toe-to toe, with Scott having the Taser in his right hand. Slager decided to use lethal force, and 1.49 seconds after having been toe-to-toe, Slager fired at Scott, who Slager described as turning to his left. Slager continued to fire until Scott fell to the ground.

A portion of the incident was captured on video by a pedestrian that was in the area at the time. The video of the incident is blurry and incomplete, but it does show the two men standing toe-to-toe at the same time the Taser is flung behind Slager. When viewed frame-by-frame, the

3

video also shows that Scott was on top of Slager during the ground fight, and also shows the Taser wire wrapped around Slager's forearm from the struggle.  Additionally, though Slager has no recollection of being "Tased" during the fight, Slager's uniform had marks on it that were consistent with being "Tased" in the drive stun mode.  Scott died as a result of the gunshots fired by Slager.

## LAW

The United States Sentencing Commission has promulgated the United States Sentencing Guidelines which address factors that may call for a departure from a computed guideline value.  As the Court is well aware, deviations from calculated sentencing guideline parameters can take on two different characters.  One is a departure, which is a deviation contemplated by operation of the Guidelines themselves.  The other is a variance, which generally springs from an application of the provisions of Title 18 U.S.C. § 3553.

Departures are of two types, upward and downward, and are characterized as either encouraged, discouraged, prohibited, or exceptional case departures, depending on the facts and circumstances underlying the departure rationale.  *See generally*, U.S. Sentencing Guidelines Manual § 5K2.10 (U.S. Sentencing Comm'n 2014).

Among the bases for a downward departure is the conduct of the victim.  That provision is as follows:

**§5K2.10.  Victim's Conduct (Policy Statement)**

> If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense. In deciding whether a sentence reduction is warranted, and the extent of such reduction, the court should consider the following:

4

(1)   The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant.

(2)   The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation.

(3)   The danger reasonably perceived by the defendant, including the victim's reputation for violence.

(4)   The danger actually presented to the defendant by the victim.

(5)   Any other relevant conduct by the victim that substantially contributed to the danger presented.

(6)   The proportionality and reasonableness of the defendant's response to the victim's provocation.

Victim misconduct ordinarily would not be sufficient to warrant application of this provision in the context of offenses under Chapter Two, Part A, Subpart 3 (Criminal Sexual Abuse). In addition, this provision usually would not be relevant in the context of non-violent offenses. There may, however, be unusual circumstances in which substantial victim misconduct would warrant a reduced penalty in the case of a non- violent offense. For example, an extended course of provocation and harassment might lead a defendant to steal or destroy property in retaliation.

Historical Note: Effective November 1, 1987. Amended effective October 27, 2003 (see Appendix C, amendment 651).

U.S. Sentencing Guidelines Manual §5K2.10 (U.S. Sentencing Comm'n 2014).

A downward departure for victim conduct is an encouraged departure. *Koon v. Powell*, 518 U.S. 81, 94 (1996).

## ANALYSIS

As a threshold matter, Scott's wrongful conduct contributed significantly to Slager's use of force.  Scott fled from a lawful traffic stop, failed to obey Slager's commands, resisted Slager's attempt to arrest him, disarmed Slager of his Taser, and advanced upon Slager, threatening him with the Taser.  Had Scott, AT ANY TIME, obeyed Slager's commands and

5

ceased resistance, Slager would not have escalated the force used. Slager's use of force was compelled by and rooted in Scott's misconduct. Therefore, it is appropriate to examine each of the considerations enumerated in §5K2.10 to determine the applicability to this matter.

    (1)   The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant.

At the time of the incident, Walter Scott was fifty years old. He stood 5'9" tall and weighed 209 pounds. He had volunteered to a previous employer that he was both a weightlifter and trained in the martial arts. (*See* Exhibit 2, "Welcome Aboard" poster from St-Gobain ADFORS.) Michael Slager was thirty-three years old. He stood 6' tall and weighed 180 pounds. *(See* Exhibit 3, Charleston County Sheriff's Office Booking Report for Michael Slager dated April 7, 2015.) At the time of the incident, Slager was wearing his duty uniform and equipment, which added another 20-30 pounds to his weight. (Transcript of *South Carolina v. Slager*, testimony of Eli Driggers, November 17, 2016, Page 14, Lines 13-17.)[2]

Slager's post–event drug test came back negative. (*See* Exhibit 4, Results from Low Country Drug Screening, LLC, dated April 4, 2015.) Scott's indicated that he had cocaine, cocaethylene (a product of cocaine and alcohol), and benzoylecgonine (BZ) in his peripheral blood. Particularly relevant to this analysis is the level of BZ, a cocaine metabolite, in Scott's blood. Literature on the toxicology results indicate that effects following cocaine use can include euphoria, excitement, restlessness, risk taking, sleep disturbance and aggression. The amount of BZ in Scott's blood, 1300ng/mL, were above those found in impaired drivers or persons admitted to an emergency room for cocaine-related medical complaints. *(See* Exhibit 5, NMS Labs Toxicology Report dated April 16, 2015.)

---

[2] Transcript references incorporate the state trial transcript previously provided to the Court.

>       (2)    The persistence of the victim's conduct and any efforts by the defendant to
>              prevent confrontation.

Scott's resistance to Slager's lawful commands was persistent and ongoing.  When pulled over, Scott could not produce registration or insurance information, so Slager ordered him to remain in the car.  Scott did not.  He exited the vehicle.  Slager, without vitriol and in a firm but non-threatening manner, asked Scott to return to his seated position. ("Have a seat in the car.")[3] Scott did so only momentarily.  Within seconds, he opened the car door and began to flee. Slager pursued Scott.

Slager told Scott to stop or he would be tased.  Scott did not.  He continued to flee as Slager warned he would deploy his Taser, and in fact did so. The Taser was ineffective and Slager deployed it again.  Slager commanded Scott to get on the ground.  Scott did not. Scott's mother testified she told Scott to "do what the officer tells you to do."  Scott did not.  Instead he wrestled with Slager, assumed a superior position and eventually gained control of the Taser from Slager.  Slager told Scott to drop the Taser or I'll have to shoot you.  Scott did not.  At this point Scott turned to his left and unseen and unbeknownst to Slager, the Taser flew out of Scott's hand.

At each step along the way, Slager faithfully followed the use of force continuum, but was never able to get Scott to comply with any of his commands.  Had Scott complied, this tragedy would not have occurred.

>       (3)    The danger reasonably perceived by the defendant, including the victim's
>              reputation for violence.

Slager reasonably perceived danger, as Scott never stopped resisting.  In fact, Scott's actions, including exiting the car when lawfully ordered to remain in the car; fleeing the car

---

[3]*See* Exhibit 6, transcript by David Hallimore, portions of which are included on compilation video.

when he was told to remain in his seat; having a passenger in the car that never made eye contact with Slager; failing to stop running when commanded; and broadcasting his position over the telephone to unknown individuals while fleeing all increased Slager's perception of danger. Additionally, Slager's shift was severely undermanned, and the two officers assigned to the street on that day with Slager had both been tasked with collateral duties and were not available for backup.   Slager's perception of his danger was amply demonstrated by his plea for immediate assistance from Habersham ("156, step it up!").  Habersham said that when he heard that call, the hair on the back of his neck stood up because he knew that Slager was in danger.

Added to this is the fact that Scott struggled for and got control over Slager's Taser.  Had Scott known how to deploy the Taser in drive-stun mode, Slager could have been incapacitated long enough for Scott to gain control of Slager's service weapon and use it on Slager or anyone else in the vicinity.   Though Slager did not know it at the time, had he had enough time to run an NCIC report, he would have discovered that Scott was considered armed and dangerous, had violent tendencies, and had a history of assault.  (R5 SAW 3038.)   Unfortunately, Scott fled before Slager could review this report.

(4)   The danger actually presented to the defendant by the victim.

As noted above, Scott presented an actual danger to Slager up until he fled, so the response to item 3 above is incorporated by reference here.  There is a series of photos attached that show the progress and effect of the confrontation.   (*See* Exhibit 7, Page 4 of Autopsy Report of Walter Scott; 5 autopsy photographs of Walter Scott; 2 photographs of Michael Slager's hands; 1 photograph from Santana video.)   Slager had Taser wire wrapped around his arm and wrist, and suffered abrasions on his hands and knees.  His fingers were cut so that he was dripping blood on forms hours after the struggle. (Transcript of *South Carolina v. Slager*,

testimony of Jamie Johnson, November 9, 2016, Page 49, Lines 9-13.) Likewise, Scott had abrasions and contusions consistent with a ground fight. [Transcript of *South Carolina v. Slager*, testimony of Thomas Owens, M.D. (Medical Examiner for Mecklenburg County, North Carolina) November 22, 2016, Page 44, Lines 16-19.]

DNA analysis of the Taser showed that Scott's DNA was predominant on the Taser and is consistent with Slager's account of the events leading up to the shooting.

> (5)  Any other relevant conduct by the victim that substantially contributed to the danger presented.

Scott's inability to explain discrepancies in the ownership of the automobile, his flight, the existence of a passenger in the car who would not acknowledge Slager, the fact that Scott was broadcasting his position over the cellphone, and Scott's unwillingness to obey Slager's lawful commands at any time during the confrontation put in motion a series of events that culminated in the fatal shooting.

> (6)  The proportionality and reasonableness of the defendant's response to the victim's provocation.

Slager followed the use of force continuum at each step along the confrontation. Starting with the vehicle stop where his presence and demeanor seemed to be controlling, to the foot chase where Scott was warned of Taser deployments, to the commands for Scott to get on the ground, to the decision to use lethal force, Slager followed his training. (R5 SAW 1660-1661.) Unknown to Slager at the time was the fact that Scott was unarmed when fleeing. Slager's use of force became disproportionate and unreasonable as Scott continued to flee.

## VARIANCE

In addition to this Motion for Downward Departure, Slager will also be arguing for a downward variance from the computed guideline range based on the parsimony provision of Title 18 U.S.C. § 3553 along with other factors, including but not limited to, the adverse effect that dual prosecution by the State of South Carolina and the Department of Justice has had on Slager and his ability to prepare for trial, and the personal, financial, familial, and psychological effects that this pincer move had on his ability to mount a defense. The national and international press that focused on this matter was magnified when the DOJ indicted Slager before his state trial started.

Slager declared he was ready for his federal trial in September of 2016, but the DOJ opposed his desire to go to trial on the federal charges first. Instead, they employed their dilatory tactics to watch the state trial in its entirety, sending attorneys and investigators from the DOJ to most hearings and every day of the five-week trial. By refusing to try what they had already indicted, DOJ forced Slager into the certainty of two legal proceedings, stacked one upon the other, for the same underlying conduct. While the prudent thing for all involved may have been to wait until the disposition of the state trial before proceeding with indictment, the DOJ instead decided to engage in simultaneous instead of consecutive prosecutions. The burden of defending these actions simultaneously took this matter out of the heartland of cases contemplated by the United States Sentencing Commission and has been recognized as a valid basis for variance. *See*, *Koon*, 518 U.S. at 112.

Likewise, Slager will also be requesting a variance due to the high susceptibility of prison abuse, as well as the abnormally stringent conditions of confinement he has been subjected to and which are likely to continue. The national and international press focused on Slager has already taken a toll. The home he lived in when the incident occurred was

10

firebombed.   When confined at the Sheriff Al Cannon Detention Center, he has been in a special housing unit, in solitary conditions with twenty-three hours of confinement each day and only one hour out of the 7' by 13' cell for exercise.

These conditions of confinement are unlikely to be relaxed in the Bureau of Prisons custody.  "[D]ue in large part to the existence of the videotape and all the events that ensued, widespread publicity and emotional outrage ... have surrounded this case from the outset, which led the District Court to find petitioner particularly likely to be targets of abuse during their incarceration. The District Court's conclusion that this factor made the case unusual is just the sort of determination that must be accorded deference by the appellate courts."     *Id*. (internal citations and quotations omitted).  Thus, a variance based on previous and anticipated conditions of confinement makes this a case outside the heartland of cases reflected in the Sentencing Guidelines and thus a downward variance based on conditions of confinement is appropriate and justified.


## CONCLUSION

The United States Sentencing Commission has designated victim's conduct as a basis for downward departure.  The United States Supreme Court has approved the use of this departure where the use of force begins lawfully and subsequently crosses over into unlawful force.

> [T]he same Guideline range applies both to a government official who assaults a citizen without provocation as well as instances like this where what begins as legitimate force becomes excessive. The District Court did not abuse its discretion in differentiating between the classes of cases, nor did it do so in concluding that unprovoked assaults constitute the relevant heartland. Victim misconduct is an encouraged ground for departure. A district court, without question, would have had discretion to conclude that victim misconduct could take an aggravated assault case outside the heartland of § 2A2.2. That petitioners' aggravated assaults were committed under color of law does not change the analysis.

*Koon v. United States*, 518 U.S. 81, 105 (1996)(finding a five-level departure from the calculated guideline range a reasonable application of this provision).

Therefore, Slager respectfully requests, given the facts and circumstances surrounding the event, that he be granted a downward departure due to Scott's conduct during the encounter that led to the lawful, then unlawful, use of force.  Additionally, Slager will be arguing for a downward variance based on, *inter alia*, the hardships of dual prosecution and the susceptibility to abuse in prison, as well as previous and anticipated onerous conditions of confinement.  These circumstances constitute unusual conditions not taken into consideration by the United States Sentencing Commission in drafting the Guidelines.

<div style="margin-left: 40%;">

Respectfully submitted,

BY:   *S/Andrew J. Savage, III*
     ANDREW J. SAVAGE, III
     Federal ID Number: 3734
     SAVAGE LAW FIRM
     15 Prioleau Street
     Charleston, SC  29401
     Telephone:  (843) 720-7470


BY:   *S/Donald L McCune, Jr.*
     DONALD L. McCUNE, JR.
     Federal ID Number: 11474
     SAVAGE LAW FIRM
     15 Prioleau Street
     Charleston, SC 29401
     Telephone: (843) 720-7470

     ATTORNEYS FOR DEFENDANT

</div>

Charleston, South Carolina

November 30, 2017

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO.: 2:16-cr-378 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -versus- | ) | |
| | ) | |
| MICHAEL THOMAS SLAGER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MOTION FOR DOWNWARD DEPARTURE PURSUANT TO U.S.S.G. §5K2.10
AND NOTICE OF GROUNDS FOR VARIANCE**

Michael Slager, by and through his attorney Andrew J. Savage, III, hereby moves this Court to grant a downward departure in this sentencing pursuant to U.S.S.G. §5K2.10. The following information is presented in support of this request.

**FACTS**

On April 4, 2015, Michael Slager was working as a police officer for the North Charleston Police Department. In that capacity, he initiated a traffic stop on a vehicle that had an inoperative third brake light.[1] After initiating the stop, he approached the vehicle to address the driver, Walter Scott. Mr. Scott was seated in the vehicle along with a companion, Pierre

---

[1] For a compilation and timeline of the events as captured by patrol car dash cam, Slager's body microphone and consolidated dispatch tapes, *see* Exhibit 1.

1

Fulton.  During the initial interview, Slager addressed Scott from the driver's door. Slager asked for the vehicle registration and proof of insurance coverage, which Scott could not produce. When queried, Scott gave conflicting stories regarding the ownership of the vehicle he was driving.  Slager took Scott's license and returned to his own vehicle to check the status of Scott's license in the computer database.

Before Slager had a chance to complete the check, Scott exited the vehicle and stood. Slager told him to return to the vehicle, and Scott complied.  Shortly thereafter, Scott again exited the vehicle and started running from the scene.  Slager pursued him.  During the foot chase, Slager twice warned Scott to stop or that he would deploy his Taser.  After each warning, Scott continued to run.  Neither Taser shot (done in the probe mode) was effective.  Nonetheless, after a chase on foot of approximately 200 yards, and shortly after the second ineffective Taser shot, Scott went down to the ground.  Slager approached Scott in an attempt to gain control over him.

It is important to note that the neighborhood that Slager was patrolling was a designated Compstat area, that is, an area with a history of high crime rates that is targeted for focused additional police coverage.  Likewise, it is important to note that the day of the incident, Slager was essentially alone patrolling the streets in his assigned geographic bureau.  His supervisor was on leave, and of the seven other officers assigned to that shift, only three were available for duty.  Slager was performing the traffic stop; Ptl. Banias was retrieving a laptop that had been mistakenly left in a rental car; and Ptl. Habersham was serving a warrant on an inmate at the Charleston County Detention Center (who unknown to Habersham and presumably unknown to dispatch had already been released).

During the foot chase, Slager broadcast his location and the fact of the chase on the dispatch radio to notify dispatch and other officers of the situation. Likewise, Scott had been broadcasting his location to an individual unknown to Slager on a cell phone that Scott carried during the chase. When Scott went to the ground, Slager heard a voice telling Scott to cooperate with the police. Slager presumed that he was being joined by one of his fellow officers admonishing Scott – he later learned that the voice was that of Scott's mother coming from Scott's cell phone urging him to cooperate with the police.

Cooperation was not part of Scott's plan. He continued to struggle as Slager tried to handcuff him. Slager attempted to use his Taser in the "drive-stun" mode to gain compliance with his commands, but Scott was not deterred. In fact, he continued to resist. After a 200-yard chase and a struggle on the ground, Slager was winded and frightened. He was attempting to pin Scott down with his left elbow, while reaching for his dispatch microphone to call for responding officers to "step it up," when Scott wrested the Taser from Slager.

Scott turned the Taser around and pointed it at Slager. Slager was losing the fight on the ground. His forearm was wrapped in Taser wire, he had cuts and contusions, had been mounted by Scott who had gained control of his Taser, and he was in fear for his life. Both men managed to stand up, and Slager made one last attempt to get the Taser back from Scott. As they arose, they were toe-to toe, with Scott having the Taser in his right hand. Slager decided to use lethal force, and 1.49 seconds after having been toe-to-toe, Slager fired at Scott, who Slager described as turning to his left. Slager continued to fire until Scott fell to the ground.

A portion of the incident was captured on video by a pedestrian that was in the area at the time. The video of the incident is blurry and incomplete, but it does show the two men standing toe-to-toe at the same time the Taser is flung behind Slager. When viewed frame-by-frame, the

3

video also shows that Scott was on top of Slager during the ground fight, and also shows the Taser wire wrapped around Slager's forearm from the struggle.  Additionally, though Slager has no recollection of being "Tased" during the fight, Slager's uniform had marks on it that were consistent with being "Tased" in the drive stun mode.  Scott died as a result of the gunshots fired by Slager.

<u>**LAW**</u>

The United States Sentencing Commission has promulgated the United States Sentencing Guidelines which address factors that may call for a departure from a computed guideline value. As the Court is well aware, deviations from calculated sentencing guideline parameters can take on two different characters.  One is a departure, which is a deviation contemplated by operation of the Guidelines themselves.   The other is a variance, which generally springs from an application of the provisions of Title 18 U.S.C. § 3553.

Departures are of two types, upward and downward, and are characterized as either encouraged, discouraged, prohibited, or exceptional case departures, depending on the facts and circumstances underlying the departure rationale.  *See generally*, U.S. Sentencing Guidelines Manual § 5K2.10 (U.S. Sentencing Comm'n 2014).

Among the bases for a downward departure is the conduct of the victim.  That provision is as follows:

**§5K2.10.  <u>Victim's Conduct</u> (Policy Statement)**

> If the victim's wrongful conduct contributed significantly to provoking the offense behavior, the court may reduce the sentence below the guideline range to reflect the nature and circumstances of the offense. In deciding whether a sentence reduction is warranted, and the extent of such reduction, the court should consider the following:

(1)    The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant.

(2)    The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation.

(3)    The danger reasonably perceived by the defendant, including the victim's reputation for violence.

(4)    The danger actually presented to the defendant by the victim.

(5)    Any other relevant conduct by the victim that substantially contributed to the danger presented.

(6)    The proportionality and reasonableness of the defendant's response to the victim's provocation.

Victim misconduct ordinarily would not be sufficient to warrant application of this provision in the context of offenses under Chapter Two, Part A, Subpart 3 (Criminal Sexual Abuse). In addition, this provision usually would not be relevant in the context of non-violent offenses. There may, however, be unusual circumstances in which substantial victim misconduct would warrant a reduced penalty in the case of a non- violent offense. For example, an extended course of provocation and harassment might lead a defendant to steal or destroy property in retaliation.

Historical Note: Effective November 1, 1987. Amended effective October 27, 2003 (see Appendix C, amendment 651).

U.S. Sentencing Guidelines Manual §5K2.10 (U.S. Sentencing Comm'n 2014).

A downward departure for victim conduct is an encouraged departure. *Koon v. Powell*, 518 U.S. 81, 94 (1996).

## ANALYSIS

As a threshold matter, Scott's wrongful conduct contributed significantly to Slager's use of force.  Scott fled from a lawful traffic stop, failed to obey Slager's commands, resisted Slager's attempt to arrest him, disarmed Slager of his Taser, and advanced upon Slager, threatening him with the Taser.  Had Scott, AT ANY TIME, obeyed Slager's commands and

ceased resistance, Slager would not have escalated the force used. Slager's use of force was compelled by and rooted in Scott's misconduct. Therefore, it is appropriate to examine each of the considerations enumerated in §5K2.10 to determine the applicability to this matter.

> (1) The size and strength of the victim, or other relevant physical characteristics, in comparison with those of the defendant.

At the time of the incident, Walter Scott was fifty years old. He stood 5'9" tall and weighed 209 pounds. He had volunteered to a previous employer that he was both a weightlifter and trained in the martial arts. (*See* Exhibit 2, "Welcome Aboard" poster from St-Gobain ADFORS.) Michael Slager was thirty-three years old. He stood 6' tall and weighed 180 pounds. (*See* Exhibit 3, Charleston County Sheriff's Office Booking Report for Michael Slager dated April 7, 2015.) At the time of the incident, Slager was wearing his duty uniform and equipment, which added another 20-30 pounds to his weight. (Transcript of *South Carolina v. Slager*, testimony of Eli Driggers, November 17, 2016, Page 14, Lines 13-17.)[2]

Slager's post–event drug test came back negative. (*See* Exhibit 4, Results from Low Country Drug Screening, LLC, dated April 4, 2015.) Scott's indicated that he had cocaine, cocaethylene (a product of cocaine and alcohol), and benzoylecgonine (BZ) in his peripheral blood. Particularly relevant to this analysis is the level of BZ, a cocaine metabolite, in Scott's blood. Literature on the toxicology results indicate that effects following cocaine use can include euphoria, excitement, restlessness, risk taking, sleep disturbance and aggression. The amount of BZ in Scott's blood, 1300ng/mL, were above those found in impaired drivers or persons admitted to an emergency room for cocaine-related medical complaints. (*See* Exhibit 5, NMS Labs Toxicology Report dated April 16, 2015.)

---

[2] Transcript references incorporate the state trial transcript previously provided to the Court.

(2)     The persistence of the victim's conduct and any efforts by the defendant to prevent confrontation.

Scott's resistance to Slager's lawful commands was persistent and ongoing.  When pulled over, Scott could not produce registration or insurance information, so Slager ordered him to remain in the car.  Scott did not.  He exited the vehicle.  Slager, without vitriol and in a firm but non-threatening manner, asked Scott to return to his seated position. ("Have a seat in the car.")[3] Scott did so only momentarily.  Within seconds, he opened the car door and began to flee. Slager pursued Scott.

Slager told Scott to stop or he would be tased.  Scott did not.  He continued to flee as Slager warned he would deploy his Taser, and in fact did so. The Taser was ineffective and Slager deployed it again.  Slager commanded Scott to get on the ground.  Scott did not. Scott's mother testified she told Scott to "do what the officer tells you to do."  Scott did not.  Instead he wrestled with Slager, assumed a superior position and eventually gained control of the Taser from Slager.  Slager told Scott to drop the Taser or I'll have to shoot you.  Scott did not.  At this point Scott turned to his left and unseen and unbeknownst to Slager, the Taser flew out of Scott's hand.

At each step along the way, Slager faithfully followed the use of force continuum, but was never able to get Scott to comply with any of his commands.  Had Scott complied, this tragedy would not have occurred.

(3)   The danger reasonably perceived by the defendant, including the victim's reputation for violence.

Slager reasonably perceived danger, as Scott never stopped resisting.  In fact, Scott's actions, including exiting the car when lawfully ordered to remain in the car; fleeing the car

---

[3]*See* Exhibit 6, transcript by David Hallimore, portions of which are included on compilation video.

when he was told to remain in his seat; having a passenger in the car that never made eye contact with Slager; failing to stop running when commanded; and broadcasting his position over the telephone to unknown individuals while fleeing all increased Slager's perception of danger. Additionally, Slager's shift was severely undermanned, and the two officers assigned to the street on that day with Slager had both been tasked with collateral duties and were not available for backup.    Slager's perception of his danger was amply demonstrated by his plea for immediate assistance from Habersham ("156, step it up!").   Habersham said that when he heard that call, the hair on the back of his neck stood up because he knew that Slager was in danger.

Added to this is the fact that Scott struggled for and got control over Slager's Taser.   Had Scott known how to deploy the Taser in drive-stun mode, Slager could have been incapacitated long enough for Scott to gain control of Slager's service weapon and use it on Slager or anyone else in the vicinity.   Though Slager did not know it at the time, had he had enough time to run an NCIC report, he would have discovered that Scott was considered armed and dangerous, had violent tendencies, and had a history of assault.  (R5 SAW 3038.)   Unfortunately, Scott fled before Slager could review this report.

(4)   The danger actually presented to the defendant by the victim.

As noted above, Scott presented an actual danger to Slager up until he fled, so the response to item 3 above is incorporated by reference here.   There is a series of photos attached that show the progress and effect of the confrontation.   (*See* Exhibit 7, Page 4 of Autopsy Report of Walter Scott; 5 autopsy photographs of Walter Scott; 2 photographs of Michael Slager's hands; 1 photograph from Santana video.)   Slager had Taser wire wrapped around his arm and wrist, and suffered abrasions on his hands and knees.   His fingers were cut so that he was dripping blood on forms hours after the struggle. (Transcript of *South Carolina v. Slager*,

testimony of Jamie Johnson, November 9, 2016, Page 49, Lines 9-13.)  Likewise, Scott had abrasions and contusions consistent with a ground fight. [Transcript of *South Carolina v. Slager*, testimony of Thomas Owens, M.D. (Medical Examiner for Mecklenburg County, North Carolina) November 22, 2016, Page 44, Lines 16-19.]

DNA analysis of the Taser showed that Scott's DNA was predominant on the Taser and is consistent with Slager's account of the events leading up to the shooting.

    (5)   Any other relevant conduct by the victim that substantially contributed to the danger presented.

Scott's inability to explain discrepancies in the ownership of the automobile, his flight, the existence of a passenger in the car who would not acknowledge Slager, the fact that Scott was broadcasting his position over the cellphone, and Scott's unwillingness to obey Slager's lawful commands at any time during the confrontation put in motion a series of events that culminated in the fatal shooting.

    (6)   The proportionality and reasonableness of the defendant's response to the victim's provocation.

Slager followed the use of force continuum at each step along the confrontation. Starting with the vehicle stop where his presence and demeanor seemed to be controlling, to the foot chase where Scott was warned of Taser deployments, to the commands for Scott to get on the ground, to the decision to use lethal force, Slager followed his training.  (R5 SAW 1660-1661.) Unknown to Slager at the time was the fact that Scott was unarmed when fleeing.  Slager's use of force became disproportionate and unreasonable as Scott continued to flee.

## VARIANCE

In addition to this Motion for Downward Departure, Slager will also be arguing for a downward variance from the computed guideline range based on the parsimony provision of Title 18 U.S.C. § 3553 along with other factors, including but not limited to, the adverse effect that dual prosecution by the State of South Carolina and the Department of Justice has had on Slager and his ability to prepare for trial, and the personal, financial, familial, and psychological effects that this pincer move had on his ability to mount a defense. The national and international press that focused on this matter was magnified when the DOJ indicted Slager before his state trial started.

Slager declared he was ready for his federal trial in September of 2016, but the DOJ opposed his desire to go to trial on the federal charges first. Instead, they employed their dilatory tactics to watch the state trial in its entirety, sending attorneys and investigators from the DOJ to most hearings and every day of the five-week trial. By refusing to try what they had already indicted, DOJ forced Slager into the certainty of two legal proceedings, stacked one upon the other, for the same underlying conduct. While the prudent thing for all involved may have been to wait until the disposition of the state trial before proceeding with indictment, the DOJ instead decided to engage in simultaneous instead of consecutive prosecutions. The burden of defending these actions simultaneously took this matter out of the heartland of cases contemplated by the United States Sentencing Commission and has been recognized as a valid basis for variance. *See*, *Koon*, 518 U.S. at 112.

Likewise, Slager will also be requesting a variance due to the high susceptibility of prison abuse, as well as the abnormally stringent conditions of confinement he has been subjected to and which are likely to continue. The national and international press focused on Slager has already taken a toll. The home he lived in when the incident occurred was

10

firebombed.   When confined at the Sheriff Al Cannon Detention Center, he has been in a special

housing unit, in solitary conditions with twenty-three hours of confinement each day and only

one hour out of the 7' by 13' cell for exercise.

These conditions of confinement are unlikely to be relaxed in the Bureau of Prisons

custody.   "[D]ue in large part to the existence of the videotape and all the events that ensued,

widespread publicity and emotional outrage ... have surrounded this case from the outset, which

led the District Court to find petitioner particularly likely to be targets of abuse during their

incarceration. The District Court's conclusion that this factor made the case unusual is just the

sort of determination that must be accorded deference by the appellate courts."     *Id*. (internal

citations and quotations omitted).   Thus, a variance based on previous and anticipated conditions

of confinement makes this a case outside the heartland of cases reflected in the Sentencing

Guidelines and thus a downward variance based on conditions of confinement is appropriate and

justified.


**CONCLUSION**

The United States Sentencing Commission has designated victim's conduct as a basis for

downward departure.  The United States Supreme Court has approved the use of this departure

where the use of force begins lawfully and subsequently crosses over into unlawful force.

> [T]he same Guideline range applies both to a government official who assaults a
> citizen without provocation as well as instances like this where what begins as
> legitimate force becomes excessive. The District Court did not abuse its
> discretion in differentiating between the classes of cases, nor did it do so in
> concluding that unprovoked assaults constitute the relevant heartland. Victim
> misconduct is an encouraged ground for departure. A district court, without
> question, would have had discretion to conclude that victim misconduct could
> take an aggravated assault case outside the heartland of § 2A2.2. That petitioners'
> aggravated assaults were committed under color of law does not change the
> analysis.

11

*Koon v. United States*, 518 U.S. 81, 105 (1996)(finding a five-level departure from the calculated guideline range a reasonable application of this provision).

Therefore, Slager respectfully requests, given the facts and circumstances surrounding the event, that he be granted a downward departure due to Scott's conduct during the encounter that led to the lawful, then unlawful, use of force.  Additionally, Slager will be arguing for a downward variance based on, *inter alia*, the hardships of dual prosecution and the susceptibility to abuse in prison, as well as previous and anticipated onerous conditions of confinement.  These circumstances constitute unusual conditions not taken into consideration by the United States Sentencing Commission in drafting the Guidelines.

Respectfully submitted,

BY:   *S/Andrew J. Savage, III*
ANDREW J. SAVAGE, III
Federal ID Number: 3734
SAVAGE LAW FIRM
15 Prioleau Street
Charleston, SC  29401
Telephone:  (843) 720-7470


BY:   *S/Donald L McCune, Jr.*
DONALD L. McCUNE, JR.
Federal ID Number: 11474
SAVAGE LAW FIRM
15 Prioleau Street
Charleston, SC 29401
Telephone: (843) 720-7470

ATTORNEYS FOR DEFENDANT

Charleston, South Carolina

November 30, 2017